598 August 6, 2015 No. 30

IN THE SUPREME COURT OF THE
STATE OF OREGON

HEWLETT-PACKARD COMPANY,
*Plaintiff-Respondent,*

*v.*

BENTON COUNTY ASSESSOR,
*Defendant,*

*and*

DEPARTMENT OF REVENUE,
*Defendant-Appellant.*

(TC4979, TC4980, TC4987;
S061456 (Control), S061457, S061458)

En Banc

On appeal from the Oregon Tax Court.*

Henry C. Breithaupt, Judge.

Argued and submitted on June 24, 2014.

Joseph A. Laronge, Assistant Attorney General, Salem, argued the cause and filed the briefs for appellant. With him on the brief was Ellen Rosenblum, Attorney General.

David L. Canary, Garvey Schubert Barer, Portland, argued the cause for the respondent. Cynthia M. Fraser filed the brief for the respondent. With her on the brief was David L. Canary and William K. Kabeiseman.

BALMER, C. J.

The judgment of the Oregon Tax Court is affirmed.

_____
* 21 OTR 186 (2013).

**BALMER, C. J.**

In this direct appeal from the Oregon Tax Court Regular Division (Tax Court), we must decide whether the Tax Court properly applied administrative rules governing property tax appraisals. Specifically, this case requires us to consider the relationship between two terms defined in the Department of Revenue's administrative rules: "highest and best use" and "value of the loss." *See* OAR 150-308.205-(D)(1)(c) (defining highest and best use); OAR 150-308.205-(F)(3)(k) (defining value of the loss). A property's highest and best use is, among other things, the most profitable use that a potential owner could make of the property. The value of the loss measures the negative value created by components of the property that prevent it from cost-effectively serving its highest and best use.

The department appeals from a decision of the Tax Court that accepted the property valuation proposed by taxpayer Hewlett-Packard (HP). In reaching that conclusion, the Tax Court held that the highest and best use of HP's property was a continuation of its current use as a single-tenant, owner-occupied research and manufacturing facility. The Tax Court also held that, of the numerous buildings on the campus, a potential owner would anticipate using only certain "core" buildings and would not anticipate using the "non-core" buildings. As a result, those non-core buildings were components of the property that prevented it from cost-effectively serving its highest and best use. The Tax Court, therefore, assessed the value of the loss caused by the presence of the non-core buildings. To do so, the Tax Court calculated the additional operating expenses that an owner would incur while operating the subject property—which has both the core and non-core space—as compared to the operating expenses that an owner would incur while operating a cost-effective version of the property consisting of only the core space.

In this appeal, the department does not challenge the Tax Court's findings that the non-core buildings were an overdevelopment or that the highest and best use of the property was as a single-tenant, owner-occupied research and manufacturing facility. Instead, the department raises

the narrow issue of whether the Tax Court properly applied the administrative rule defining the value of the loss, OAR 150-308.205-(F)(3)(k). According to the department, the Tax Court erred by calculating the value of the loss as if a potential owner would make no alterations to the subject property. The department contends that the Tax Court should have calculated the value of the loss as if a potential owner would convert the non-core space into marketable rental space, which, according to the department, would result in more value than leaving the non-core space vacant.

We reject the department's argument because it presumes that the most valuable use of the non-core buildings is as marketable rental space. That presumption is inconsistent with the Tax Court's analysis of the highest and best use of the property. The department, however, does not challenge that analysis. That is, the department does not ask us to review the factual basis for the Tax Court's determination that the highest and best use of the property is as a single-tenant, owner-occupied research and manufacturing facility or the Tax Court's application of the department's administrative rules that govern the highest and best use determination. *See* ORS 305.445 (scope of review). As a result, we assume that the highest and best use of the non-core buildings is to leave them unaltered rather than to convert them to marketable space. Given that assumption, the Tax Court properly identified the value of the loss as the additional operating expenses that an owner would incur to operate the subject property compared to a more cost-effective option. We therefore affirm the decision of the Tax Court.

The department's rules defining the highest and best use and the value of the loss are part of a complex scheme of administrative rules outlining the methods and procedures that the department requires for appraising industrial plants, like HP's property. *See generally* OAR 150-308.205-(D) (describing the valuation process); OAR 150-308.205-(F) (describing methods for valuing property inefficiencies). To assess the department's contention that the Tax Court misapplied those rules, we must consider how the highest and best use and the value of the loss fit within

the department's larger scheme of methods and procedures as well as the Tax Court's relevant factual findings.

The subject property is HP's 178-acre manufacturing and research campus in Corvallis, Oregon. HP pays taxes on both its real property and personal property. The real property consists of the land and its improvements. The personal property is HP's equipment located on site. In this case, the parties dispute the value of the real estate improvements for the three tax years beginning in 2008 and ending in 2011.

Those improvements include 28 buildings containing about 2 million square feet. The buildings share common utilities and are linked by a long corridor. HP constructed the buildings between the 1970s and the 1990s and has used the buildings to support as many as 8,000 employees while developing and manufacturing parts for scientific calculators and ink-jet printers. By 2007, however, HP had reduced the number of components manufactured at that property and needed only about 2,000 employees on site. At that time, HP identified the property's "core space" as 1.2 million square feet contained in 17 buildings. The remaining 800,000 square feet was identified as the "non-core" space. Over the next couple of years, HP consolidated its operations into the core space and vacated the non-core space. After the consolidation, HP began leasing out a small portion of the recently vacated non-core space to outside firms.

For the tax years of 2008-09 and 2009-10, Benton County assessed the total value of the improvements at $76 million and $79 million respectively. HP did not challenge those assessments but asked the Tax Court to review Benton County's assessment of HP's equipment on the property. Benton County counterclaimed, contending that it had undervalued the improvements in 2008-09 and 2009-10. For the next tax year, 2010-11, Benton County assessed the value of the improvements at $200 million.

After a partial settlement resolving the value of HP's equipment, the parties presented evidence to the Tax Court on the only remaining issue—the extent to which HP's improvements contributed to, or detracted from, the "real market value" of HP's property. *See* ORS 308.232 (requiring

"ad valorem property taxation" to be based on the property's "real market value"). Generally, a property's real market value is the amount of money an informed and disinterested seller could reasonably expect an informed and disinterested buyer to pay for the property on the date of the assessment. *See* ORS 308.205(1) (defining real market value).

To find how much a potential buyer would pay to own the property, an appraiser must follow the appraisal methods and procedures adopted by the department. ORS 308.205(2) (requiring a property tax appraisal to be completed "in accordance with rules adopted by the Department of Revenue"). The department's rules call for an appraiser to value the property according to its "highest and best use." OAR 150-308.205-(D)(3)(i) ("Determining the highest and best use for the unit of property is necessary for establishing real market value."). The department requires valuing property according to its highest and best use because a seller "can expect to receive the highest offer from a prospective buyer who intends to put the property to its most profitable use." *STC Submarine, Inc. v. Dept. of Rev.*, 320 Or 589, 592 n 5, 890 P2d 1370 (1995).

The department defines "highest and best use" as "the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible, and that results in the highest value. See The Appraisal of Real Estate, 12th edition (2001)." OAR 150-308.205-(D)(1)(c).[1] To find a property's highest and best use, an appraiser identifies the property's potential alternative uses and tests them against the criteria set out in the department's definition of highest and best use. Those alternative uses "may include, among others, all possible uses that might result from retaining, altering or ceasing the integrated nature of the unit of property." OAR 150-308.205-(D)(3)(i). For an improved property, those alternative uses often consist of "continuation of the existing

---

[1] The last criterion, requiring that the highest and best use "result[] in the highest value," OAR 150-308.205-(D)(1)(c), is frequently described as requiring that the use be "maximally productive." *See, e.g.*, Appraisal Institute, *The Appraisal of Real Estate* 307, 314, 318 (12th ed 2001) (referring to a use as being "maximally productive" or resulting in the "maximum productivity"). We understand the terms "highest value" and "maximally productive" as having the same meaning in this context.

use, renovation or rehabilitation, expansion, adaptation or conversion to another use, partial or total demolition, or some combination of these alternatives." *Appraisal of Real Estate* at 315.[2]

An appraiser uses the results from the highest and best use analysis to produce a final valuation opinion. *See id.* at 60 ("Through the highest and best use analysis, the appraiser \*\*\* identifies the use or uses on which the final opinion of value is based."). As a result, "[t]he *first* issue is the highest and best use of the property; the *second* issue is the market value of the property at that use." *Freedom Fed. Savings and Loan v. Dept. of Rev.*, 310 Or 723, 727, 801 P2d 809 (1990) (emphasis in original); *see also Appraisal of Real Estate* at 305 ("[H]ighest and best use can be described as the foundation on which market value rests.").

After establishing the property's highest and best use, an appraiser develops a final opinion of the property's real market value by considering three different "approaches" to value: cost, income, and sales comparison. OAR 150-308.205-(D)(3)(a); *see also* ORS 308.411(1) (requiring the use of cost, income, or sales comparison approaches). The cost approach relies on the cost of constructing a substitute property that provides the same utility as the subject property at its highest and best use. The income approach relies on the profits that the property can generate at its highest and best use. And the sales comparison approach relies on sale prices of other properties that can serve the same highest and best use as the subject property. An appraiser must consider each approach even though the appraiser may determine, after consideration, that not all three approaches are appropriate in a specific case. OAR 150-308.205-(D)(3)(a). An appraiser then reconciles the indications of value produced by the appropriate approaches and concludes the analysis with a final valuation opinion.

---

[2] The definition of highest and best use refers to the "use of vacant land or improved property." OAR 150-308.205-(D)(1)(c). There are differences in the analysis of the highest and best use of property *as if vacant* and the highest and best use of property *as improved*. *See, e.g.*, *Appraisal of Real Estate* at 309-19 (outlining steps for the highest and best use as if vacant and highest and best use as improved). The parties have not argued that those differences affect the highest and best use conclusions reached in this case.

Although the highest and best use analysis necessarily precedes the *final* valuation opinion, an appraiser often must apply the three approaches to value while developing *preliminary* valuation estimates of the property's alternative uses for the highest and best use analysis. After all, the final step in the highest and best use analysis is to identify the use that produces the "highest value." OAR 150-308.205-(D)(1)(c). Doing so is consistent with *Appraisal of Real Estate*, which is cited as the source of the department's definition of highest and best use. *Id.* According to *Appraisal of Real Estate*,

> "Highest and best use analysis often incorporates techniques and data from the application of all three approaches to value. *** In many appraisal assignments, the final tests of financial feasibility and maximum productivity require information that is obtained from the application and development of the approaches. Therefore, even though the discussion of highest and best use traditionally precedes the approaches to value in narrative appraisal reports, the conclusion of highest and best use often can be finalized only after a preliminary analysis of alternative uses has been performed."

*Appraisal of Real Estate* at 319.

At the hearing before the Tax Court, the parties disputed both the highest and best use of the property and the real market value of the property at that use. They presented evidence from expert appraisers in support of their respective positions. On both issues, the Tax Court accepted the factual analysis and opinions offered by HP's expert. *See Hewlett-Packard Co. v. Benton County Assessor*, 21 OTR 186, 188-97 (2013) (determining the highest and best use and the real market value).

According to HP's expert, the highest and best use of the property was to continue using it in the same manner that HP had been using it—a single-purpose, owner-occupied facility serving a variety of "manufacturing and research and development operations." *Id.* at 189.[3] In reaching that

---

[3] In his report, HP's expert described the highest and best use as the "continued use as a specially designed single purpose campus style owner occupied manufacturing facility."

conclusion, HP's expert determined that, given the market of potential buyers for that type of property, a potential owner could not cost-effectively make productive use of the non-core space. Instead, HP's expert concluded that a potential owner would simply leave the non-core space vacant while making productive use of the core space. Based on that opinion, the Tax Court found that the highest and best use of the property was "use by a single manufacturer using the core space and leaving the [non-core] space empty." *Id.* at 192.

The parties spent considerable time at the hearing addressing whether a potential owner could make productive use of the non-core space. According to the Tax Court, the department's expert offered her opinion that "the space not used by a hypothetical purchaser of the property—the so called 'non-core' space—would be absorbed by other users in the market, at very healthy lease rates and with few, if any, conversion costs to make the existing space attractive at such lease rates." *Id.* at 190-91. Under the department's reasoning, the property's highest and best use would have multiple uses, where a potential owner would use the core space for its own research and manufacturing and use the non-core space as marketable rental property generating rental income.[4]

HP's expert disagreed and concluded that the conversion to marketable rental space could not satisfy all of the criteria for the highest and best use—that the use be legally permissible, physically possible, financially feasible, and result in the highest value. *See* OAR 150-308.205-(D)(1)(c) (defining highest and best use). First, HP's expert found that the property was not zoned to be used as rental property and questioned whether the department's proposed conversion was legally permissible. Second, the expert determined that the department's proposed conversion was not financially feasible. He reached that conclusion by "look[ing] at the costs, over time, of converting the existing space into space suitable for leasing to others and then weigh[ing] that cost against reasonably expected returns over time." *Hewlett-Packard*, 21 OTR at 189. Based on that analysis,

---

[4] *See Appraisal of Real Estate* at 325 ("Highest and best use often include more than one use for a parcel of land or an improved property.").

HP's expert concluded that "the cost of conversion to marketable space exceeded the benefits of such conversion." *Id.* Specifically, HP's expert asserted that converting the non-core space into income-generating rental property would result in a net loss of about $13 million. As a result, HP's expert stated that such a conversion was not financially feasible. *Id.*

The Tax Court adopted the opinions offered by HP's expert on those issues. According to the Tax Court, "the record shows that there are not insignificant questions about the legal obstacles that would be presented by trying to lease out the excess space." *Id.* at 191. Further, the Tax Court concluded that "[a]ll of the evidence regarding the actual demands of the market in Corvallis, the location of the property relative to major transportation facilities, the actual condition of the property and other factors" undermined the department's position that a potential owner would convert the non-core space into marketable rental property. *Id.* The Tax Court found that the opinion offered by HP's expert was "consistent with the unrebutted testimony of witnesses for taxpayer with knowledge of these improvements in particular and the market for space in Corvallis in general." *Id.* As a result, the Tax Court "accept[ed] the conclusion that the costs of maintaining the excess space and converting it to space that would be attractive to the market would exceed the value to be produced by the potential rental of that space." *Id.* For those reasons, the Tax Court ultimately concluded that the highest and best use of the property was a continuation of its existing use as a single-purpose, owner-occupied research and manufacturing facility where a potential owner would use the core space for research and manufacturing and leave the non-core space vacant.

After establishing the highest and best use of the property, the Tax Court considered the conflicting valuation opinions offered by the parties' experts. HP's expert considered all three approaches to value—cost, income, and sales comparison—but he concluded that the income approach was not appropriate. Under the sales comparison approach, HP's expert considered the prices buyers recently paid for similar single-purpose, owner-occupied research and manufacturing properties, and concluded that HP's

improvements were worth $63 million on all three assessment dates.

Under the cost approach, HP's expert found the cost to build a new and cost-effective single-purpose, owner-occupied research and manufacturing property that provides the same utility as HP's property. He then adjusted that cost to reflect the property's depreciation. One type of depreciation is based on the negative value created by components of the subject property that fail to cost-effectively serve the property's highest and best use. The value of the loss, which is the target of the department's appeal, is part of that depreciation analysis and will be discussed further below. Under the cost approach, HP's expert concluded that the improvements were worth $65 million in 2008, $68 million in 2009, and $64 million in 2010.

HP's expert then reconciled the results from the cost approach and the sales comparison approach. His reconciliation produced a final valuation of the improvements that matched his results from the cost approach. As a result, HP's expert offered his final opinion that the real market value of HP's improvements was $65 million in 2008, $68 million in 2009, and $64 million in 2010.

The department's expert reached final opinions of the real market value that were substantially higher: $210 million for 2008, $217 million for 2009, and $179 million for 2010. However, the department's expert reached those final valuation opinions by valuing the improvements according to a highest and best use that the Tax Court ultimately rejected—namely, that the property would be used entirely or partially to generate rental income. Additionally, the department, both through its expert and in its post-trial briefing, attempted to rebut the methodology that HP's expert used.

Because the real market value is based on the highest and best use of the property, the Tax Court rejected the valuation opinions of the department's expert and accepted the testimony of HP's expert on the value of the property at its highest and best use. *Id.* at 196 ("[T]he real market values for the subject property as found by the appraiser for taxpayer are accepted by the court as the real market

values for the subject properties as of the respective assessment dates."). As a result, the Tax Court found that, for the purposes of assessing property taxes, the real market value of HP's improvements was $65 million in 2008, $68 million in 2009, and $64 million in 2010.

The department appeals the Tax Court's decision on the real market value. We review final decisions and orders of the Tax Court for "errors or questions of law or lack of substantial evidence in the record to support the tax court's decision or order." ORS 305.445. The department does not argue that the Tax Court erred when it adopted the factual conclusions or the highest and best use analysis of HP's expert. Instead, the department contends that, even if the Tax Court correctly decided the facts and the highest and best use of the property, the Tax Court nevertheless erred when it adopted the final valuation opinion offered by HP's expert.

According to the department, HP's expert determined the real market value using a methodology that failed to comply with the department's administrative rules. Specifically, the department contends that HP's expert, and therefore the Tax Court, misapplied the department's rule defining value of the loss, which is a step in the process for calculating depreciation under the cost approach. *See* OAR 150-308.205-(F)(3)(k) (defining value of the loss).[5] Value of the loss is generally the excess operating costs that an owner will incur as the result of inefficiencies in the property that prevent the property from cost-effectively serving its highest and best use. *Id.* The department argues that, as a matter of law, HP's expert misapplied the department's rule on the value of the loss and, therefore, that the Tax Court erred

---

[5] The department's definition of value of the loss includes technical terms that will be explained further below. That definition states,

"The value of the loss equals the present value of the after-tax loss in anticipated income from the continuing operation of the property with a deficiency or superadequacy compared to the projected operation of the replacement property. For industrial plants, this loss in income is often the result of excess operating costs due to inefficiencies in the subject plant compared to the subject property when cured of the functional obsolescence. The present value includes factors for the time period that the plant will continue to incur the loss in income and an appropriate discount rate. See OAR 150-308.205-(C) for the appropriate method of calculating the discount rate."

OAR 150-308.205-(F)(3)(k).

as a matter of law by adopting the misapplication of the rule by HP's expert.

As an initial matter, HP argues that a Tax Court determination of the real market value of property is a fact issue and not a legal issue. In support, HP cites *Reynolds Metals Co. v. Dept. of Rev.*, 299 Or 592, 705 P2d 712 (1985), *on recons*, 300 Or 250, 709 P2d 710 (1985), in which we identified the fact issues in that case as including the dollar value of a property's depreciation. *Id.* at 594 ("The major issues of fact are the dollar value of physical depreciation and the dollar value of functional obsolescence in the plant.").

HP, however, misreads *Reynolds Metals*. Although the valuation issues in *Reynolds Metals* were fact issues, nothing in that decision states that valuation issues are *always* and *entirely* fact issues. To be sure, the valuation process—including the highest and best use analysis and the approaches to value—is fact intensive. The process frequently requires an appraiser to collect data on the physical property, the real estate market, and larger economic trends. And an appraiser may exercise professional judgment while both collecting that data and weighing its relevance. Further, the final opinion of value offered by an expert appraiser is just that—an expert opinion. To decide a property's real market value, the Tax Court often resolves fact issues relating to the competing testimony of appraisal experts, including the credibility and persuasiveness of those experts.

Despite the fact-intensive nature of the valuation process, the relevant statutes and department rules may impose legal constraints on that process. And interpretations of those statutes and rules remain legal issues. *See [Hopkins v. SAIF](#)*, 349 Or 348, 355, 245 P3d 90 (2010) ("Whether one expert is more persuasive than another in a particular case can be important in resolving a factual question; it cannot, however, determine the legal meaning of a statutory term."). The statutes and rules governing the valuation process leave room for opposing appraisal experts to comply with the governing statutes and rules while still reaching different results. Nevertheless, determining the meaning and scope of the statutes and rules is a question of

law. Whether an appeal challenging a valuation judgment raises a factual issue or a legal issue depends on the question presented.

The question that the department presents here relates to the interpretation of the department's rule defining the value of the loss, OAR 150-308.205-(F)(3)(k). That is a legal issue. The department stated repeatedly in its briefing and at oral argument that it was not asking this court to reconsider the Tax Court's factual findings. As a result, we consider only the narrow legal issue that the department raises: whether the rule defining value of the loss required the Tax Court to calculate the value of the loss differently than it did.

Because the department is the source of the rule defining value of the loss, OAR 150-308.205-(F)(3)(k), the department's interpretation of that rule is entitled to deference "as long as its interpretation is a plausible one and not inconsistent with the rule, its context, or any other source of law." *Powerex Corp. v. Dept. of Rev.*, 357 Or 40, 54, 346 P3d 476 (2015) (quotation omitted). Context plays an important role in this case, both because the rule at issue refers to technical terms used in other rules and because the rule itself is part of a larger scheme of rules governing the valuation process. We therefore consider that context before assessing the rule defining value of the loss and the plausibility of the department's interpretation of that rule.

As noted above, the value of the loss is a component of the depreciation analysis within the cost approach to value. "The cost approach to value is based upon the principle of substitution, that is, it assumes that property is worth its cost or the cost of a satisfactory substitute with equal utility." *Delta Air Lines, Inc. v. Dept. of Rev.*, 328 Or 596, 605, 984 P2d 836 (1999). At its most basic level, the cost approach requires an appraiser to calculate the cost to construct a substitute property and then deduct value from that cost to account for the subject property's depreciation—namely, attributes of the subject property that detract from its market value.

In this case, HP's expert used the replacement cost approach, which starts by calculating the cost to build "a property having equivalent utility to the subject property but built with the most cost-effective materials, design, and layout." OAR 150-308.205-(F)(3)(b); *see also Hewlett-Packard*, 21 OTR at 195 (stating that the parties both applied the replacement cost approach).[6] The department's rules define "[t]he most cost-effective materials, design, and layout" as the "combination of investment (cash out-flows) and the present value of anticipated after tax net income (cash in-flows) that produces the highest net present value." OAR 150-308.205-(F)(3)(b).

Because the replacement cost approach focuses on the cost of constructing improvements with "equivalent utility to the subject property," HP's appraiser first found the utility of the subject property. He determined that only the core space provided utility to a potential owner of the property. He then divided up the square footage in the core space according to the functions that the space could support, such as office, manufacturing, and warehouse. He then multiplied the square footage for each category by the cost per square foot to construct new, cost-effective buildings that serve those same functions: new office space, new manufacturing space, and new warehouse space. The result was the cost of constructing a new 1.2 million square foot facility that could support manufacturing and research and development operations. For the 2008 assessment, HP's expert estimated that the cost of constructing a new, cost-effective version of the core space would be $192 million.[7]

HP's expert then deducted value from that replacement cost to account for the subject property's depreciation. The department's rules identify three types of depreciation: physical depreciation (age and deterioration), external

---

[6] The replacement cost approach is in contrast to the reproduction cost approach, which starts by calculating the cost to build "a new replica of the subject property *** using the same materials, design, layout, [and] quality of workmanship." OAR 150-308.205-(F)(3)(a)(A).

[7] Throughout the remainder of the opinion, we use the values for the 2008 assessment to illustrate the facts and concepts relevant to the department's challenge. Although the values are slightly different for the 2009 and 2010 assessments, the analysis is the same.

obsolescence (economic and locational factors), and functional obsolescence (construction and design inefficiencies). *See, e.g.*, OAR 150-308.205-(F)(2)(b) (referring to physical depreciation, functional obsolescence, and external obsolescence). HP's expert found no external obsolescence to deduct from the $192 million replacement cost, but he deducted $89 million for the physical depreciation of the core space and $38 million for its functional obsolescence. Based on those values, HP's expert concluded that, for the 2008 assessment, the cost approach indicated that the subject property was worth about $65 million.

The department does not challenge the values HP's expert used for the replacement cost, the physical depreciation, or the external obsolescence. Instead, of all the steps in the process HP's expert used in the cost approach, the department challenges only the value HP's expert used for the property's functional obsolescence. The department's rules for finding a property's functional obsolescence include the calculation for the value of the loss.

The department's rules define functional obsolescence as

"a loss in market value of a subject property when there is a reasonable feasibility of a typical prospective purchaser acquiring, without undue delay, a replacement property possessing an equivalent utility but is more cost-effective in terms of design, materials, or equipment."

OAR 150-308.205-(F)(3)(c). An appraiser identifies functionally obsolete components of the subject property by comparing the subject property to the replacement property, which represents the improvements that would most cost-effectively achieve the same utility as the subject property. *Id.* ("Functional obsolescence exists only by a comparison between the subject and the replacement property.").

A functionally obsolete component can be either deficient or superadequate. A property has a deficiency if it is missing a component needed to operate more cost-effectively or if it has a substandard version of that component. *See* OAR 150-308.205-(F)(3)(c)(A)-(B) (describing deficiencies). And a property has a superadequacy if it has a component exceeding market norms or the requirements needed to

operate cost-effectively. *See* OAR 150-308.205-(F)(3)(c)(C) (describing superadequacies). Specifically, a superadequacy is "an asset present in the subject property that is not present in the replacement property and does not contribute to value an amount equal to its cost." *Id.*

In this case, HP's expert determined that HP's property had a superadequacy—namely, the non-core space. According to the analysis by HP's expert, which the Tax Court adopted, only 1.2 million square feet of the property provided utility to a potential owner. But the subject property was 2 million square feet. As a result, the subject property had 800,000 square feet of superadequate space, which corresponded to the non-core space. The department does not challenge that determination.

The indication of value that results from the cost approach must account for the presence of functionally obsolete components, such as the superadequate space on the subject property. To do so, an appraiser determines the market loss resulting from the presence of functionally obsolete components and then deducts that amount from the reproduction or replacement cost. Because HP's expert started with the replacement cost, the department's rules required a deduction using one of two potential methods for calculating the market loss: "the cost to cure or the value of the loss." OAR 150-308.205-(F)(2).

The cost to cure is the cost needed to alter the subject property so that it can operate as cost-effectively as the replacement property. *See* OAR 150-308.205-(F)(3)(h) (defining cost to cure as "the net cash out-flow anticipated to be necessary to eliminate the deficiency or superadequacy"). In this case, the cost to cure would be the cost to eliminate the non-core space and allow the property to operate in the same manner as the replacement property, consisting solely of the core space.

The value of the loss, as previously noted, is generally the additional operating costs that will result from failing to alter the subject property to match the cost-effectiveness of the replacement property. OAR 150-308.205-(F)(3)(k). The department's rules define the value of the loss as "the present value of the after-tax loss in anticipated

income from the continuing operation of the property with a deficiency or superadequacy compared to the projected operation of the replacement property." *Id.* That rule states that, "[f]or industrial plants, this loss in income is often the result of excess operating costs due to inefficiencies in the subject plant compared to the subject property when cured of the functional obsolescence." *Id.*

Between those two methods—the cost to cure and the value of the loss—an appraiser uses whichever method results in the smaller deduction. OAR 150-308.205-(F)(2). If the cost to cure is less, then the functional obsolescence is "curable." OAR 150-308.205-(F)(3)(g). If the value of the loss is less, then the functional obsolescence is "incurable." OAR 150-308.205-(F)(3)(f).

The department concedes that in this case the value of the loss is less than the cost to cure, even if we affirm the analysis that the Tax Court adopted.[8] Therefore, the non-core space is an incurable superadequacy. The market loss resulting from the presence of the non-core space is determined according to the value of the loss, and the value of the loss is deducted from the cost of the replacement property.

HP's expert determined the value of the loss, and thus the functional obsolescence, by comparing the anticipated income from operating the 2 million square foot subject property to the anticipated income from operating the 1.2 million square foot replacement property. According to HP's expert, an owner of the subject property would annually incur $4.6 million in additional operating expenses, as compared to the replacement property, until the property is redeveloped. After factoring in taxes and by applying a discount rate to the additional operating expenses incurred over the remaining economic life of the non-core space, HP's expert determined the value of the loss to be $38 million.

---

[8] The department assigned as error the manner in which HP's expert had calculated the cost to cure as well as the value of the loss. At oral argument, however, the department waived any challenge related to the cost to cure and stated that it was challenging only the value of the loss. As a result, we do not consider whether HP's expert properly calculated the cost to cure.

The department does not challenge the manner in which HP's expert calculated the taxes, the discount rate, or the remaining economic life of the non-core space. Instead, the department contends only that HP's expert erred when he calculated the "loss in anticipated income from continuing operation of the [subject] property with a deficiency or superadequacy." OAR 150-308.205-(F)(3)(k). According to the department, the value of the loss should have been $13 million instead of the $38 million used by HP's expert. The department reaches that number by relying on the highest and best use analysis performed by HP's expert. As part of that analysis and as described above, HP's expert considered whether converting the non-core space was a financially feasible use. He concluded that conversion was not financially feasible because an owner would lose $13 million by converting and maintaining the non-core space. The department contends that a potential owner would rather lose $13 million by converting the non-core space than lose $38 million by leaving the non-core space vacant. Recalculating the value of the loss as $13 million instead of $38 million would increase the cost approach valuation by $25 million, resulting in a $90 million indication of value rather than the $65 million reached by HP's expert and the Tax Court.

The difficulty with the department's analysis is fitting it within the narrow legal argument that it makes—namely, that the Tax Court misinterpreted or misapplied the rule defining the value of the loss. The department's understanding of the value of the loss is inconsistent with the valuation scheme otherwise set out in the department's rules. The value of the loss is used to measure the functional obsolescence of the subject property. OAR 150-308.205-(F)(2). And functional obsolescence is the negative value of any deficiency or superadequacy in the subject property as compared to the replacement property. OAR 150-308.205-(F)(3)(c). The replacement property provides the same utility as the subject property but uses the most cost-effective materials, design, and layout. OAR 150-308.205-(F)(2). As a result, for the purposes of determining functional obsolescence, the only difference between the subject property and the replacement property is the materials, design, and layout of the two properties.

But the department's interpretation distorts the comparison between the subject property and the replacement property. The department would allow an appraiser to consider changes to the *utility* of the subject property as part of his or her value of the loss calculation. In this case, under the department's interpretation, the subject property would provide 2 million square feet of utility that includes marketable rental space as well as an owner-occupied research and manufacturing facility. The replacement property, on the other hand, would provide only 1.2 million square feet used as an owner-occupied research and manufacturing facility. The department contends that a potential owner would use all 2 million square feet because that would generate the most value.

But it is not appropriate to measure functional obsolescence by comparing the *value* of a 2 million square foot property that includes marketable rental space as well as an owner-occupied research and manufacturing facility to the *value* of a 1.2 million square foot property used only as an owner-occupied research and manufacturing facility. That comparison occurs at the stage of determining the highest and best use. By the time an appraiser calculates the value of the loss as part of the final valuation opinion, the appraiser has already figured out the use that a potential owner would make of the property to produce the highest value or maximum productivity: that use is the property's highest and best use. *See* OAR 150-308.205-(D)(1)(c) (defining highest and best use as, among other things, the use that "results in the highest value").

Here, the Tax Court found that the highest and best use of the property was as a single-purpose, owner-occupied manufacturing and research facility. HP's expert found that the non-core space provided no utility as part of a single-purpose, owner-occupied manufacturing and research facility. The Tax Court expressly adopted that finding and valued the property as though it provided only 1.2 million square feet of utility. As a result, the non-core space was not included in the replacement property. And the value of the loss was calculated as the increased operating expenses that an owner would incur as a result of operating the subject property as compared to the replacement property. That is

entirely consistent with the department's rule, which states that the value of the loss "is often the result of excess operating costs due to inefficiencies in the subject plant compared to the subject property when cured of the functional obsolescence." OAR 150-308.205-(F)(3)(k).

HP's expert calculated those additional operating expenses as $4.6 million per year, which, when spread out over the remaining economic life of the improvements, leads to a present value of $38 million. The department calculates the operating expenses differently only because the department contends that the property should be operated to serve a different use. If the department were correct, and converting the non-core space into marketable rental property would increase the value of the property by $25 million, then the highest and best use of the property would be the mixed-use manufacturing/rental property that the department urged the Tax Court to accept. In that case, using the non-core space as marketable rental property would contribute $25 million in incremental value to the subject property over leaving the non-core space vacant, even if the non-core space continued generating operating losses after the conversion. In other words, if using the property solely as a research and manufacturing facility makes the property worth $65 million and using the property as a rental property as well as a research and manufacturing facility makes the property worth $90 million, then using the property as a rental property contributes $25 million in value.[9]

To the extent the department accurately represents the conversion costs and projected rental income used by HP's expert and the Tax Court, then the department would have identified a potential error in the highest and best use

---

[9] That is not to suggest that, even if the highest and best use was the mixed-use manufacturing/rental property that the department urged, the final valuation would increase by $25 million. Changing the highest and best use would require changing numerous other components of the cost approach, including the utility provided by the property, the scope of the replacement property, the calculation for physical depreciation, and the existence of external obsolescence. Further, changing the highest and best use would also require changes to the sales comparison approach as well as the reconciliation leading to the final valuation opinion. The wide-ranging effects of the department's argument on the valuation process highlight the impropriety of attempting to contain this issue entirely within the value of the loss.

analysis—specifically, calling into question the analysis of financial feasibility and the use that creates the highest value. But the department has not asked us to consider the proper interpretation of those criteria or the Tax Court's findings on those issues. Nor has the department asked us to review the Tax Court's conclusion that there were significant questions regarding the legal permissibility of converting the non-core space into marketable rental space. Those questions create market risk and decrease the present value of the proposed use.

It is unclear whether the financial feasibility analysis performed by HP's expert is the correct test for the financial feasibility of improved property. If converting the non-core space is not financially feasible because it leads to a loss of $13 million, then it is not immediately apparent how leaving the non-core space vacant could be financially feasible, given the conclusion of HP's expert that leaving the non-core space vacant creates a loss of $38 million. Even the Tax Court stated that HP's expert's analysis of the highest and best use was "perhaps not free from criticism." *Hewlett-Packard*, 21 OTR at 191.

Nevertheless, by concluding that the highest and best use of the property was as a single-purpose, owner-occupied manufacturing and research facility, the Tax Court held that a single-purpose, owner-occupied manufacturing and research facility was the physically possible, legally permissible, and financially feasible use that resulted in the highest value. The department does not challenge the factual or legal basis for ruling. Instead, the department maintains that we can rule in its favor without reversing the Tax Court's ruling on highest and best use. But without disturbing that ruling, we cannot accept the department's argument that a potential owner of the property would use it as a mixed-use manufacturing/rental property. Therefore, on the record before us, the Tax Court properly calculated the value of the loss.

The judgment of the Tax Court is affirmed.