IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

IAN A. TAYLOR and MARY L. TAYLOR,   )
                                              )
          Plaintiffs,                )   TC-MD 180110G
                                              )
     v.                        )
                                              )
MULTNOMAH COUNTY ASSESSOR,    )
                                              )
          Defendant.            )   **FINAL DECISION[1]**

This residential property valuation case is ready for decision after trial. Plaintiffs appealed from the order of the Multnomah County Board of Property Tax Appeals (BOPTA) sustaining the 2017–18 tax roll real market value of the subject property, identified as account R192211. Plaintiff Ian Taylor appeared and testified on Plaintiffs' behalf, and Plaintiff Mary Taylor also testified for Plaintiffs. John James appeared on behalf of Defendant, and Jeff Sanders, Oregon Registered Appraiser, testified on behalf of Defendant. Plaintiffs' exhibits 1 to 11 and Defendant's exhibit A were admitted without objection.

## I. STATEMENT OF FACTS

The subject property consisted of a single-family residence on a 16,524 square foot (0.38 acre) flag lot in southwest Portland. (Exs 1 at 1; A at 12.) The nature of the lot was well described by Plaintiffs:

> "The lot on which the house stands slopes steeply in two directions, with the lowest part of the lot designated an environmental zone (wet land); it is close to Wood's Creek. Only a small amount of the lot is useable and the house occupies most of the useable area. The lot is located below other lots, resulting in continual run off, drainage, and pooling problems during wet weather. The bottom area has experienced flooding these past few years, due to Wood's Creek

---

[1] This Final Decision incorporates without change the court's Decision, entered March 14, 2019. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

bursting its banks."

(Ex 1 at 1.) Mr. Taylor testified that, in addition to flooding every two to three years, the creek was occasionally polluted by sewage spills. Fill had been used in the site preparation, which, while providing a stable base for the house, had caused drainage problems and disappointing results to Plaintiffs' landscaping efforts.

Plaintiffs stated their concern regarding Defendant's "continual and marked increases in the assessments of the market value for the land," noting that for 2017–18 the subject's land had been valued much higher relative to improvements than it had been in 1984. (Ex 1 at 1.) Plaintiffs provided a chart of the subject's tax roll real market values since 1984, showing that its land value had increased more rapidly than its improvements value in recent years. (Ex 4.) Plaintiffs opined that Defendant's trending data for land was skewed by "sales of older homes on large lots to investors, who have demolished the homes, split the lots, and built multiple houses on the land." (Ex 1 at 3.) Plaintiffs stated that the subject's lot could not be similarly divided because of the steep slopes and flooding. (*Id*.)

The house was built in 1984, when Plaintiffs purchased it. (Exs 1 at 1; A at 12.) Its gross living area was 1,825 square feet, with three bedrooms and two bathrooms. (Ex A at 12.) In the years before 2017, Plaintiffs had replaced the roof and the windows. Plaintiffs stated that refurbishment and repair was needed for a bathroom and the kitchen, as well as the carpets and flooring. (Ex 1 at 2–3.) Contractor bids for the bathroom work ranged from $27,405 to "$40,000 to $80,000," and a bid for the kitchen remodel was for $97,500. (Exs 5–6.) Plaintiffs estimated that completion of all needed work would cost "well in excess of $100,000." (Ex 1 at 3.) Mr. Taylor testified that while the kitchen was useable on the assessment date it suffered from a loose sink, plumbing issues, stove ventilation issues, and worn surfaces and trim. In

addition, the subject shared a driveway with neighboring residences that was in need of maintenance.

Plaintiffs estimated the subject's 2017–18 real market value at $350,000, consisting of a land value of $150,000 and an improvements value of $200,000. (Ex 1 at 1.) Mr. Taylor testified that he arrived at that estimate by generating trend lines from the subject's historical tax roll values and following them out. The total-value trend line on Plaintiffs' exhibit indicates a value somewhere between $400,000 and $420,000 at the point two-fifths of the distance between the years 2015 and 2020. (Ex 4.)

Plaintiffs provided five comparable sales: three "comparables" and two "superior comparables." (Exs 7–10.) The comparable sale prices ranged from $370,000 to $457,000; dates of sale ranged from December 2016 to December 2017. (Exs 8, 10.) Dates of construction ranged from 1968 to 1991. (*Id.*) Lot sizes ranged from 7,098 square feet to 12,196 square feet; gross living areas were not provided. (*Id.*) Each of the comparables was located one mile away from the subject. (*Id.*) Of the two comparables with sale prices below $400,000, one had been rehabilitated after a garage fire and the other had an unfinished basement. (Ex 7 at 4, 6.) Mr. Taylor testified that he did not verify any of the sales by calling the listing agents and that he did not make any adjustments.

Defendant's appraiser concluded in his report that the subject's current use as a single-family residence was its highest and best use as of January 1, 2017. (Ex A at 6–7.) He considered the three approaches to value and determined the sales comparison approach was most applicable, given the subject's age and highest and best use. (*Id.* at 10.) He provided three comparable sales. (*Id.* at 12.) The unadjusted sale prices ranged from $450,000 to $475,000; dates of sale ranged from June 2016 to April 2017. (*Id.*) Dates of construction ranged from

1979 to 1983. (*Id.*) Lot sizes ranged from 0.16 acre to 0.26 acre; gross living areas ranged from 1,806 square feet to 1,929 square feet. (*Id.*) Two comparables were located 0.04 mile away from the subject; one comparable was located 1.75 miles from the subject. (*Id.*) Defendant's appraiser made adjustments for differences in dates of sale, lot size, view, condition, room count, and gross living area totaling up to 5.1 percent of the unadjusted sales prices. (*Id.*) The adjusted comparable sale prices ranged from $451,000 to $468,000. (*Id.*) Defendant's appraiser concluded to a real market value of $461,000 as of January 1, 2017. (*Id.* at 10.)

Additional factual details are included in the analysis where pertinent.

The 2017–18 tax roll real market value sustained by BOPTA was $454,360, with $225,000 allocated to land and $229,360 allocated to improvements. (Compl at 3.) Plaintiffs request that the real market value be reduced to $350,000, with $150,000 allocated to land and $200,000 to improvements. (*Id.* at 1.) Defendant requests that the tax roll value be sustained. (Answer at 1.)

## II. ANALYSIS

At issue is the real market value of the subject property as of January 1, 2017. Because Plaintiffs seek a reduction in the subject's tax roll real market value, they must bear the burden of proof by a preponderance of the evidence. *See* ORS 305.427.[2]

Valuation of property for ad valorem taxation is a fact-intensive process subject to legal constraints. *Hewlett-Packard Co. v. Benton County Assessor*, 357 Or 598, 609, 356 P3d 70 (2015). Real property appraisal is a discipline with established methodologies that assessors are required to consider—the sales comparison, cost, and income approaches to value. ORS 308.205(2); OAR 150-308-0240(2)(a). The goal of all three approaches is finding "the amount

---

[2] The court's references to the Oregon Revised Statutes (ORS) are to 2015.

in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year." ORS 308.205(1).

A.      *Plaintiffs' Valuation*

Mr. Taylor did not use a standard appraisal methodology, but relied on what he termed an "informed buyer's approach." His approach separately considered the value of the subject's land and its improvements.

1.      *Land value*

With respect to the land, Mr. Taylor produced a chart of past assessed values showing that the subject's tax roll land value had increased significantly faster since 2015 than in previous years. Mr. Taylor attributed the increased land value to Defendant's valuing the subject as if it were suitable for subdivision and further development. Mr. Taylor argued that the challenges inherent in the lot—an environmental zone rendering portions of it unbuildable, seasonal flooding and drainage problems, erosion along the slopes, and occasional sewage contamination in the creek—rendered it undevelopable and distinguished it from other lots of comparable size. Mr. Taylor testified that his requested land value of $150,000 was derived from applying a trend line to the subject's historical assessed land values.

Mr. Taylor's computation of land value by trending presupposes that tax roll values of the past are good evidence of a property's value. However, this court reviews tax roll values "without any presumption as to the correctness of the assessor's valuation." *J. R. Widmer, Inc. v. Dept. of Rev.*, 261 Or 371, 378, 494 P2d 854 (1972). That is why assessors defend their valuations in court with appraisals; the tax roll value by itself is not persuasive. Even if drawing a trend line from a single property's historical values were a credible method of valuation, such a trend would only be

as reliable as the data underlying it.[3]  Mr. Taylor did not provide evidence supporting the accuracy of Defendant's past tax rolls.  In fact, Mr. Taylor himself challenges the accuracy of Defendant's recent tax roll valuations.  The evidentiary value of Mr. Taylor's land-value trend is slight, if not nonexistent.

2.      *Improvements value*

Mr. Taylor argued the subject had deferred maintenance that would require Plaintiffs to make concessions if they were to sell the subject as is.  Mr. Taylor readily admitted the house was habitable, but asserted it was due for an update after having been lived in for over 30 years; for example, the kitchen sink was loose, there were some plumbing issues, and there were worn surfaces and trim in the kitchen.  Mr. Taylor argued that the five comparables he submitted were equal or superior to the subject in condition, and that because the three "similar" comparables sold for less than the subject's tax roll real market value, that real market value was too high.

While Mr. Taylor described conditions that could lower a house's market value, the evidence does not quantify the effect of those conditions.  The contractor bids are of no help; they do not reveal the extent to which they contemplate repair work that would maintain the subject's value as opposed to remodeling work that would upgrade it, and they reveal nothing at all about the condition of the comparable properties.  Mr. Taylor was unable to confirm the extent to which the comparable properties also suffered deferred maintenance and did not adjust their sale prices for condition.  Likewise, he did not adjust for other physical differences between the subject and the comparables—such as in gross living area and lot size—or for differences in the respective transactions—such as whether concessions or contingencies were involved in the

---

[3] In fact, trending based on one property's past value is unreliable evidence of its current market value. External circumstances in the market—such, as for instance, as shortage of available land for building—can affect a property's current value independent of its past value.

sales. The evidence does not even show whether Mr. Taylor's comparable sales were arm's-length transactions. The court can place no reliance on them.

B.     *Defendant's Valuation*

Defendant's appraiser effectively controverted Mr. Taylor's hypothesis that the subject had been valued as if it were fit for subdivision, agreeing that the surplus land on the subject was not buildable and that the subject's highest and best use was its current use. Defendant's appraisal used the sales comparison approach. Defendant's appraiser provided three verified comparable sales—all single-family residences—and adjusted for date of sale, lot size, condition, gross living area, view, and room count. Total adjustments were relatively small, equal to or less than 5.1 percent of the unadjusted sale prices. On cross-examination, Defendant's appraiser defended his choice of comparables, asserting that the cul-de-sac location of two comparables mimicked the subject's flag lot. Defendant's appraiser further testified that the subject's larger lot size—0.38 acre as opposed to the comparables' 0.16- to 0.26-acre lots—did not present an obstacle to comparison because the houses on the subject and the comparables alike used most of their lots' buildable areas. His conclusion that the subject's excess land was not buildable was further shown by the relatively small, $2,600- to $4,800-upward adjustments he made for his comparables' differences from the subject's lot size.

Defendant's appraisal provides a credible indicator of value, with verified comparables requiring relatively small adjustments, including two comparables located less than half a mile from the subject. Plaintiffs did not provide evidence on which the court could find another value.

/ / /

/ / /

### III. CONCLUSION

Plaintiffs did not carry their burden of proof. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ____ day of April, 2019.

_____
POUL F. LUNDGREN
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Poul F. Lundgren and entered on April 2, 2019.*