IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

ROBERT SCHIEDLER          )
and FRANCES SCHIEDLER,     )
                          )
        Plaintiffs,        )     TC-MD 230062N
                          )
    v.                     )
                          )
LINCOLN COUNTY ASSESSOR,   )
                          )
        Defendant.         )     **DECISION**

Plaintiffs appealed the assessment of property identified as Account R256463 (subject property) for the 2022-23 tax year.  A trial was held on June 13, 2023, in the courtroom of the Oregon Tax Court.  Robert Schiedler (Schiedler) appeared and testified on behalf of Plaintiffs. Joel Matz (Matz), appraiser, appeared via WebEx and testified on behalf of Defendant. Plaintiffs' Exhibits 1 to 9 and Defendant's Exhibits A to I were received without objection.

I.  STATEMENT OF FACTS

The subject property is a 1,426-square-foot, single-story house built in 1962 with a detached garage situated on 1.11 acres with an ocean view, in Waldport, Oregon.  (Ptfs' Ex 6 at 2; Def's Ex B at 1, 3.)  It has community water and a septic system.  (*Id*.)  Schiedler testified Plaintiffs purchased the subject property for $117,000 in 2012 in a bank sale.

The parties agree that the subject house requires a significant amount of work to become a habitable structure.  (Def's Ex B at 1.)  Schiedler testified the house is burdened by a multitude of issues, including pest damage; water damage; rotten wood; a collapsed fireplace; and no heat source.  (*See* Ptfs' Ex 9 (photos).)  Aside from general upkeep and compliance with the required conditions to obtain homeowners insurance, Plaintiffs have made no improvements to the house. Schiedler testified the house is currently used exclusively for storage, though he eventually plans

to demolish the house—at an estimated cost of $5,000 to $6,000—and build a new residence. He testified that the subject garage was in "good condition," estimating it would cost under $10,000 to build a replacement.

Schiedler testified that, despite the subject property's land size, much of it is steep hillside covered in brush that is unsuitable for building. (*See* Ptfs' Ex 3 (cross hatching on map marks hill sections); Ex 7 (measurements).) He measured the property himself, concluding it consisted of 28,669 square feet of hillsides ill-suited for building. (*See* Ptfs' Ex 7.) Schiedler determined the subject property had two flat spots on two distinct levels, an upper and a lower, that are 11,880 square feet and 5,913 square feet, respectively. (*See id.*) He noted that the subject property also includes a 120-foot-long gravel driveway "up the east hill." (*Id.*)

Matz noted that, at 1.11 acres, the subject property is substantially larger than the average lot in Waldport, at 0.17 acres. (Def's Ex B at 1.) He presented an email from the Waldport City Planner stating the subject property "could potentially be partitioned into [three] separate parcels[,] as long as the minimum lot widths, depths, etc[.] are met." (Def's Ex C at 1.[1]) Matz testified that he visited the subject property and found, based on the topography, that it could be divided into two level lots with ocean views. (*See* Def's Ex B at 1, 5 (photos).)

A.    *Plaintiffs' Value Evidence*

Schiedler relied solely on comparable sales to determine the subject property's value. He presented two sales, both of which were located within the same neighborhood as the subject property, Seabrook. (*See* Ptfs' Ex 3.) Schiedler testified Seabrook is a "lower-end area," where many of the houses are small and have gravel driveways, which he distinguished from nicer

---

[1] The City Planner's calculation reflected a minimum lot size of 15,000 square feet for the subject property because it's served by public water only, not sewer. (Def's Ex C at 1.)

neighborhoods such as Sandpiper Village, located across the river from the subject property.

Schiedler testified that his comparable 1 is a 0.76-acre lot that sold for $125,000 in 2022. (*See* Ptfs' Ex 3.) He testified that the lot is flat with no hills and the entire area is suitable for building. Schiedler testified the subject property contains less buildable land than comparable 1. He testified that he visited comparable 1 and observed that, although it did not have a full ocean view, it had an "ocean peek" view from the southwest corner of the property. Matz disagreed, testifying that comparable 1 had no ocean view; comparable 1 was heavily treed, had no structures on the land, and could be divided into at least two lots. (Def's Ex H at 1.[2])

Schiedler's comparable 2 is a 0.23-acre lot with a home built in 1960 that sold for $145,000 in 2022. (Ptfs' Ex 3; Def's Ex I at 3-4.) He testified that the property was cluttered with trash, but the home was livable. Schiedler testified that the former owner was forced to sell due to health problems. (*See* Def's Ex I at 4 (conservator's deed).) Matz considered the sale distressed for that reason. He testified that a real estate agent intended to purchase comparable 2, however, she realized the sale would not be arm's length, so the agent's family member purchased the property and later transferred it into the agent's name. (*See id.*) Matz testified comparable 2 had little to no ocean view.

B.    *Defendant's Value Evidence*

Matz testified that there were not many sales in 2020, but by the 2022-23 tax year he observed more demand for houses and more sales activity. Matz also relied on the sales comparison approach. He first analyzed the subject property's value in its current condition with a partially complete structure, and then analyzed its value as vacant land.

---

[2] Matz wrote that, according to the listing, the lot could be divided into three lots, but he "assume[d] just two buildable lots[,] same as the subject." (Def's Ex H at 1.)

1. *Subject property value as unfinished home*

Matz testified that he used three sales of partially constructed homes, some in better and some in worse condition than the subject property. (*See* Def's Ex D.)  Comparable 1 is a 1,064-square-foot home with an attached garage on a 0.23-acre located in Waldport, which sold for $260,000 in January 2023. (*Id*.)  The house is close to the bay and has a view of the bridge. (*Id.*)  Matz testified that the house is in better condition than the subject property, though it is a "fixer-upper," as it requires a new foundation. (*See id.* at 2.)

Comparable 2 is a 0.24-acre parcel that includes the foundation from a house that burned down. (Def's Ex D at 1.)  It is in Bayshore, has an ocean view, sold for $250,000 in 2023, and cannot be subdivided. (*Id*.)  Schiedler testified comparable 2 is in the Sandpiper neighborhood, not Bayshore, describing Sandpiper as a high-end community with covenants, conditions, restrictions, and protected views, among other benefits.

Comparable 3 is a 0.21-acre parcel with a 1,284-square-foot house built in 1983. (Def's Ex D at 1.)  It is in South Beach, does not have an ocean view, sold for $305,000 in 2022, and cannot be subdivided. (*Id*.)  Matz testified the house was more developed than the subject property.  Schiedler testified that the comparable 3 house was substantially nicer than the subject property and nearly finished.  He characterized South Beach as a high-end community near Newport that is nicer than the subject's neighborhood.  Matz disputed Schiedler's description of the South Beach neighborhood as compared to the subject's neighborhood.

2. *Subject property valued as two buildable lots*

For this analysis, Matz assumed the subject property structures had no value.  He testified that he is required to value the subject property at its highest and best use (HBU) in accordance with Department of Revenue rules. (*See* Def's Ex H at 6 (defining HBU).)  Matz determined

that dividing the subject property into two buildable lots is its HBU as bare land and valued it accordingly using the sales comparison approach.

Matz reviewed bare land sales and found that an ocean view is worth approximately $60,000 per buildable lot. (*See* Def's Ex H at 5.) That is based on five view lots that sold in 2021 to 2022 for an average price of $132,000 compared to five non-view lots that sold in the same time period for an average of $72,333. (*Id.*) Matz applied his view adjustment to Schiedler's comparable sale 1. (*See id.* at 4.) Considering the parcel as two buildable lots, he adjusted $120,000 for the lack of ocean views ($60,000 per lot), and then adjusted $15,000 for the cost of site clearing for an indicated value of $260,000. (*Id.*) Schiedler testified that the property contained harvestable timber, an asset Matz did not adjust for. He also disagreed that with Matz's conclusion that the subject property should be divided into two lots.

C.     *Real Market Value, Maximum Assessed Value, and Assessed Value*

For the 2020-21 tax year, the parties stipulated to a real market value (RMV) of $150,540 with $5,000 attributed to the improvements and the balance to the land. (Compl at 11.) The subject property's 2020-21 maximum assessed value (MAV) was $166,290 and its assessed value (AV) was $150,540. (*See id.*) The subject property's 2021-22 RMV and AV were each $150,810. (*Id.* at 6.) The subject property's 2022-23 RMV was $199,800, with $5,000 attributed to improvements and the balance to the land. (*Id*. at 3.) The subject property's 2022-23 MAV and AV were each $166,290. (*Id*.) Plaintiffs appealed to the Board of Property Tax Appeals (board), which sustained the 2022-23 roll values. (*Id*.) Plaintiffs request a 2022-23 RMV of $155,184. (*Id.* at 3.) Defendant requests the court sustain the 2022-23 board RMV.

Schiedler argued that Defendant violated Measure 50 because the subject property's 2022-23 value increased by more than three percent over the prior year's value. He provided his

own calculation of the subject property's value based on a three percent increase per year starting with $117,000 in 2012. (Ptfs' Ex 8.) Schiedler calculated a 2022-23 value of $161,854.[3] (*Id.*)

## II. ANALYSIS

The issues presented are the subject property's RMV, MAV, and AV for the 2022-23 tax year. RMV is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1).[4] The assessment date for the 2022-23 tax year was January 1, 2022. *See* ORS 308.007; 308.210. As discussed below, MAV and AV are each determined in accordance with statute. *See* ORS 308.146(1), (2).

As the party seeking affirmative relief, Plaintiffs bear the burden of proof by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). Evidence that is inconclusive or unpersuasive fails to meet the burden of proof. *See Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.    *Real Market Value*

RMV is determined using the cost, sales comparison, and income approaches to value. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003). Although all three approaches to value must be considered, not all three apply to each property. Oregon Administrative Rules (OAR) 150-308-0240(2)(a). Both parties here used the sales comparison approach. The sales comparison

---

[3] Schiedler did not identify which value – RMV, MAV, or AV – he sought to challenge.

[4] The court's references to the Oregon Revised Statutes (ORS) are to 2021.

approach derives a property's value by comparing it to the sales of other similar properties. *Magno v. Dept. of Rev.*, 19 OTR 51, 58 (2006). "[T]he sales comparison approach relies on sale prices of other properties that can serve the same highest and best use as the subject property." *Hewlett–Packard Co. v. Benton County Assessor*, 357 Or 598, 603, 356 P3d 70 (2015). To be comparable, properties should be "similar in size, quality, age and location" to the subject property. *Richardson v. Clackamas County Assessor*, TC–MD 020869D, 2003 WL 21263620 at *3 (Or Tax M Div, Mar 26, 2003).

The parties' value evidence raises questions about the subject property's HBU: whether the house should be demolished and whether the land should be divided into two lots. HBU is the first question to be addressed because it impacts the selection of comparable properties. OAR 150-308-0240(2)(i); *Hewlett-Packard Co. v. Benton County Assessor*, 21 OTR 186, 188 (2013). HBU analysis is also used to determine whether a property's improvements should be maintained, cured (in the case of deferred maintenance), modified, or demolished. Appraisal Institute, *The Appraisal of Real Estate* 307-308 (15th ed 2020).[5] HBU is "the reasonably probable use * * * that is legally permissible, physically possible, financially feasible, and maximally productive, which results in the highest real market value." OAR 150-308-0240(1)(e).

Neither party made a complete analysis of the subject property's HBU. Schiedler maintains that the subject property's HBU is as a single parcel, and that the house should be

---

[5] "If the value of the property as improved is greater than the value of the site as though vacant less demolition costs, then the existing improvements contribute value to the property's highest and best use and should not be demolished at that time. When the improvements no longer contribute positively to value net of demolition costs, then demolition and redevelopment of the ideal improvement would be economically supportable."

*The Appraisal of Real Estate* at 314.

demolished and replaced. Matz found that a market existed for partially complete or damaged houses and determined the subject property's value on that basis. However, he also presented an analysis of the subject property's value as bare land, divided into two ocean view lots. Matz provided persuasive evidence that dividing the subject property was legally permissible and physically possible.[6] Matz did not, however, include costs to demolish the subject house or costs to divide the subject land into two parcels.[7] Such evidence would help determine which uses were financially feasible and maximally productive.

Due to the incomplete evidence, the court is unable to reach a conclusion as to the subject property's HBU and considers the value of the subject property both as improved and as vacant.

1. *Subject property's value as improved*

Schiedler presented one improved sale, a 0.23-acre lot with a home that sold for $145,000 in 2022. However, that sale was made under duress due to the owner's health condition. "When non-typical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.), the transaction may not be used in the sales comparison approach unless market-based adjustments can be made for the non-typical market condition." OAR 150-308-0240(2)(c). Schiedler did not make any adjustment for that condition of sale, or any other differences in the property, so the court places no weight on the sale.

Matz relied on three comparable sales of properties with partially constructed houses that indicated an unadjusted value range of $250,000 to $305,000. Schiedler argued that two of the sales were in nicer neighborhoods than the subject property and two were in better condition.

---

[6] Specifically, Matz presented an email from the city planner and gave persuasive testimony based on his visit to the subject property. Schiedler acknowledged the subject property included two level spots, notwithstanding the steep hillsides.

[7] Schiedler presented evidence of the house's poor condition and estimated demolition would cost $5,000 to $6,000 but did not provide any independent or third-party evidence supporting that estimate.

Matz did not make any adjustments to his sales for those or other differences from the subject property. To be persuasive, sales should usually be "adjusted for time, location, size, quality, and other distinguishing differences * * *." *Yarbrough v. Dept. of Rev.*, 21 OTR 40, 44, (2012). Here, Matz's unadjusted sales indicate an upper range of value for the subject property but do not clearly indicate a precise value due to the lack of adjustments for differences.

2. *Subject property's value as vacant, RMV conclusion*

Both parties considered the sale of the nearby lot for $125,000 in 2022. Schiedler made no adjustments to the sale price despite differences in size, views, tree cover, and improvements. Matz adjusted the sale for views, cost to clear the site, and on the basis that it could be divided into two lots, indicating an adjusted price of $260,000 for the subject property. Schiedler considered this analysis Matz's most persuasive, though he questioned Matz's failure to account for the value of timber on the comparable property.

Matz's conclusion of $260,000 is more persuasive than the unadjusted sale price of $125,000, especially accounting for the differences in view. That said, the subject property's value as of January 1, 2022, was likely less than $260,000 because that value does not account for the costs associated with dividing the parcel and demolishing the house.

Considering the subject property either as improved or as vacant, the court finds that the 2022-23 roll and board RMV of $199,800 is supported and finds no basis to reduce it.

B. *Maximum Assessed Value and Assessed Value*

Plaintiffs argue the subject property's 2022-23 assessment violates the constitutional limit provided in Measure 50 by reflecting an increase of more than three percent over the prior year's roll values. Article XI, section 11 of the Oregon Constitution, also known as Measure 50, was adopted by the voters in 1997. *AKS LLC v. Dept. of Rev.*, 23 OTR 300, 315 (2019). It created a

MAV for each property that was capped at three percent annual growth, subject to certain exceptions. *Id.*; *see also* Or Const, Art XI, § 11(1)(b). Property is taxed on AV, which is the lesser of RMV or MAV. *See id*; *see also* Or Const, Art XI, § 11(1)(f).

For the 2020-21 tax year, the subject property's MAV was $166,290, as reflected in the parties' stipulated agreement. Its AV became $150,540, the RMV agreed upon by the parties, because that was less than the MAV. For the 2021-22 tax year, the subject property's RMV increased slightly to $150,810, which was also its AV, because that amount was less than its MAV of $166,290. For the 2022-23 tax year, the subject property's RMV increased to $199,800 so the AV became $166,290 based on its MAV, the lesser of the two amounts. Although the subject property's AV increased by more than three percent between the 2021-22 and 2022-23 tax years, the MAV did not; in fact, the MAV did not increase at all between those years. *See* ORS 308.146(1) (in MAV formula, MAV might not increase by three percent where it exceeds prior year's AV). The subject property's 2022-23 MAV did not exceed the three percent cap provided in Measure 50. Unlike MAV, increases in AV are not capped at three percent.[8]

### III.  CONCLUSION

Upon careful consideration, the court concludes that Plaintiffs failed to prove by a preponderance of the evidence that the subject property's 2022-23 RMV was overstated. The court further concludes that the subject property's 2022-23 MAV and AV do not violate the three percent cap on MAV increases in Measure 50. Now, therefore,

/ / /

---

[8] *See, e.g., Gall v. Yamhill County Assessor*, TC-MD 060207C, 2006 WL 1667453 at *5 (Or Tax M Div, June 15, 2006) (a nine percent increase to AV allowed by the court). For a more detailed explanation and example of the relationship between RMV, MAV, and AV over time, including changes to AV that exceed three percent, *see Comcast Corp. v. Dept. of Rev.*, 22 OTR 233, 260 (2016) *overruled on other grounds by Dish Network v. Dept. of Rev.*, 364 Or 254, 434 P3d 379 (2019).

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal of the assessment of property identified as Account R256463 for the 2022-23 tax year is denied.

Dated this _____ day of December 2023.

_____

***If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.***

***Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.***

***This document was signed by Presiding Magistrate Allison R. Boomer and entered on December 29, 2023.***