IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| KEVIN SIMPSON, TR, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 180234N |
| | ) | |
| v. | ) | |
| | ) | |
| BENTON COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION**[1] |

Plaintiff appeals the 2017-18 real market value and maximum assessed value of property identified as Account 83513 (subject property). A trial was held on December 18, 2018, in the courtroom of the Oregon Tax Court in Salem, Oregon. Plaintiff appeared and testified on his own behalf. Kacie Ropp (Ropp), Property Appraiser, appeared and testified on behalf of Defendant.

Plaintiff's Exhibits 1 and 2 and Defendant's Exhibits A through H were received without objection. Plaintiff offered several additional exhibits on rebuttal, including letters from two contractors, comparable sales, and Defendant's 2017 Real Market Value Certified Ratio Study and Report. Defendant objected to those exhibits because they were not timely exchanged. Generally, exhibits must be exchanged within the time provided by Tax Court Rule-Magistrate Division (TCR-MD) 12 C(1). However, TCR-MD 12 C(1)(c) states that "[e]xhibits submitted as rebuttal evidence do not need to be exchanged pursuant to the deadlines stated in TCR-MD 12 C(1)(a)." The court admitted page 36 of Plaintiff's Exhibit 3, the Certified Ratio Study, which provided classifications of yard improvements for 2017. The court excluded Plaintiff's other

---

[1] This Final Decision incorporates without change the court's Decision, entered May 1, 2019. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

rebuttal exhibits, finding that they served no rebuttal purpose and should have been exchanged within the time provided under TCR-MD 12 C(1)(a).

## I. STATEMENT OF FACTS

The subject property is a two-story, detached, single-family house built in 1961. (*See* Ptf's Ex 2 at 13, 23; Def's Ex A at 1.) It is approximately 3,000 square feet[2] and situated on a 0.25-acre lot. (*See* Ptf's Ex 2 at 13; Def's Exs A, G.) The subject property is in a neighborhood of houses built primarily in the 1960s, also situated on 0.25-acre lots. (*See* Def's Ex G.) Plaintiff testified that his family purchased the subject property in 1960 or 1961, when it was one of the first houses built in its subdivision.

A.      *Subject Property Quality and Condition as of January 1, 2017*

1.      *Land*

Plaintiff testified that the subject property lot is the worst lot in the neighborhood because it sits in a deep hole, creating numerous problems from water run-off. He provided photos of the subject property's steep driveway and, for comparison, photos of the flat neighboring lots. (*See* Ptf's Ex 1 at 18-22.) Plaintiff objected to Defendant's determination that the subject property's land real market value was $184,000, which is approximately the same value assigned to all the neighboring lots. (*See* Ptf's Ex 2 at 35-37.) He also objected to Defendant's classification of the subject property land as "average" rather than "fair." (*See id*. at 39; Ptf's Ex 3 at 36.)

/ / /

/ / /

---

[2] Defendant's property summary describes the subject property as having 2,993 square feet. (Def's Ex A at 1.) Plaintiff's appraisal describes the subject property as having 1,739 square feet of gross living area, 1,327 square feet of finished basement, and 364 square feet of unfinished basement. (Ptf's Ex 2 at 13.) The "hot pads" rental listing describes the subject property as 3,432 square feet. (Def's Ex F at 1.)

2.    *Improvements*

Plaintiff testified that the subject property's construction is substandard. He provided photos to illustrate ongoing problems: a termite infestation; water damage in the bathroom; a wall replaced three times due to water damage; mold in the basement; carpenter ants in the walls; dry rot; a crumbling chimney; a door that was boarded up because it was not functional; a roof that needs to be replaced; a poorly constructed roof that lacks a truss; and rafters pulling away from the center beam. (*See* Ptf's Ex 1 at 1-13, 23-28.) The deck was previously dangerous due to the potential to collapse, so Plaintiff replaced it in 2016 at a cost of $20,000. (*See* Ptf's Ex 1 at 14-16 (deck that was replaced); Def's Ex D (permits and inspections).) Plaintiff also replaced the gas furnace in 2016. (*See* Def's Ex E (permits and inspections).)

Ropp testified that Plaintiff's photos are inconsistent with the subject property's condition in 2018. She noted that some photos were date stamped from 2018, but others were from the past. (*See generally* Ptf's Ex 1.) Ropp testified, for example, that the first photo was from July 2014. (*Id.* at 1.) She and another appraiser from Defendant's office inspected the subject property on August 15, 2018, and did not see evidence of dry rot or termites. Ropp provided photos from the site inspection illustrating some of the items that had been repaired: concrete aprons had been replaced; the deck was replaced in 2016; the furnace was replaced in 2016; and a bathroom had been remodeled. (*See* Def's Ex B at 4-16.) She provided a "hot pads" ad that expired November 5, 2017, listing the subject property for rent for $1,000.[3] (Def's Ex F.) It referenced "Extensive Remodeling including Bathrooms and Bedrooms. Grade A Real Oak Hardwood Floors refinished and additional New Tile flooring, Fresh two tone paint." (*Id.* at 1.)

---

[3] The property description in the "hot pads" ad identifies the rent as $2,595 per month. (Def's Ex F at 2.) No explanation was provided for the discrepancy in rental rates.

Plaintiff testified that the photos from 2018 are stamped as such but agreed that the other photos were from earlier time periods. He testified that the photos were not meant to illustrate the subject property's current condition, but rather to represent issues that continue to occur.

Plaintiff noted that Defendant described the subject property's improvements as 95 percent depreciated in 2016-17 but changed them to 21 percent depreciated in 2017-18. (*Compare* Ptf's Ex 2 at 41 with *id. at* 38.) He noted that Defendant changed the subject property's condition from poor ("p") to average ("a") and identified it as "class 4," whereas he thinks it is a class 1 or 2. (*See id.* at 38, 41, 47.) Ropp testified that the appraiser who initially inspected the subject property's exterior changed its condition from "poor" to "average," perhaps based on the new deck and furnace. She testified that Defendant now considers the condition to be "fair" because the roof needs repair or replacement. Ropp testified that the subject property's interior is in "average" condition. She testified that, like the neighborhood, the subject property is a class 4 based on the Department of Revenue cost factor book. (*See* Def's Exs C, G.)

B.      *Highest and Best Use*

Plaintiff testified that the highest and best use of the subject property is to demolish the house and correct the slope of the lot. To support that conclusion, he provided a contractor's bid and an appraisal report, each concluding that the subject property house should be demolished. The contractor's bid, dated March 7, 2018, gives the following "site inspection notes":

> "During site visit, we discovered the following major issues which make replacement of the home the best option (rather than complete gut and repair). We are proposing to demolish the home in preparation to a future replacement on the existing foundation. The following repair work would be necessary to bring the home to a habitable state:
>
> - Structural issues with the roof, framing does not meet code and is sagging significantly
> - Termite infestation was observed, scope of damage in the walls and ceilings is significant

- Dryrot in a number of locations, scope of damage is unknown until walls and ceilings are removed
- Water is leaking into the daylight basement through the concrete walls, due to a failure of exterior drainage systems and the slope of the property toward the house
- The driveway concrete is in poor condition and is steeply sloped toward the home which has caused accidents during slippery conditions[.]"

(Ptf's Ex 2 at 1.) The bid proposes a cost of $69,008 for "excavation, fill, [and] drainage" and a cost of $35,757 for "demolition [and] removal" of the house for a total of $104,765. (*Id.* at 9.)

Plaintiff testified that he asked an appraiser to analyze the highest and best use of the subject property, and the appraiser determined that maintaining the subject property at its current use is not financially feasible. (*See* Ptf's Ex 2 at 15.) The appraiser wrote:

> "A continuation of the existing use of the subject improvements is not feasible based on the structural deficiencies. The ongoing cost to maintain this house exceeds the income potential resulting in a negative NOI. The highest and best use for the property is to remove the improvements back to vacant land and prepare the land for sale or redevelopment for a new single family residence."

(*Id.*) The appraisal report was not based on an interior inspection of the subject property. (*See id.* at 17.) The appraiser had inspected the interior for a prior appraisal, but this report was updated based on an exterior inspection on June 19, 2018, and gave an estimated market value as of June 30, 2018. (*Id.* at 13, 17.) He relied upon the contractor's conclusion that "rebuilding is not feasible" and used the contractor's cost estimates to calculate the subject property's land value.[4] (*Id.* at 13, 16.) The appraiser subtracted the cost bid from the 2017-18 tax roll land value to arrive at a value conclusion of $79,835. (*Id.* at 16.)

The appraisal report includes a "market comparable analysis" using three sales located within one mile of the subject property. (Ptf's Ex 2 at 13.) Each comparable property was in

---

[4] The appraisal report states: "This report is a hypothetical report. The extraordinary assumption is made that the G. Christianson Construction's bid is the cost to demolish the current dwelling, removal, excavation, fill and drainage. This bid is to prepare the site for the construction of a new dwelling." (Ptf's Ex 2 at 17.)

"excellent" condition compared with the subject property's "poor" condition and each was newer than the subject property. (*See id.*) The appraiser adjusted each comparable sale downward by $65,000 for condition and downward by $25,000 or $35,000 for age. (*Id.*) After adjusting for those and other differences, the appraiser concluded adjusted values ranging from $272,955 to $292,577, with an average value of $286,875. (*See id.*) Plaintiff testified that the appraiser's "market comparable analysis" was a "feasibility study" based on the "hypothetical condition that the subject property could be fixed." (*See id.* at 13, 17.) That is not stated in the report.

Ropp questioned why the contractor's bid proposed to demolish the house but retain the existing foundation given the proposal to modify the land to correct for the downward slope. She testified that an engineer's report might have been more persuasive than a contractor's bid because the contractor is selling services. Ropp questioned the statement that work was needed to bring the subject property to a "habitable" state, noting that the subject property is currently inhabited by tenants. (*See* Ptf's Ex 2 at 1.) She found that the appraisal suffered from the same problems because it was based on the contractor's bid. Ropp testified that Defendant would not value the subject property as land only based on a hypothetical analysis but would change the value if the house were demolished.

In response to the question why he continued to make repairs rather than tear down the house, Plaintiff testified that the decision is personal, not economic. The house has sentimental value because his family built it and his father provides him with money to fix it. With respect to the alleged "negative NOI,"[5] Plaintiff testified that the subject property is currently leased for $1,000 per month, but expenses and maintenance are approximately $15,000 per year. He testified that habitability does not equate to financial feasibility, adding that the subject property

_____

[5] This phrase was used in the appraisal report, but without any further explanation or calculation.

was uninhabitable for several months in 2016, presumably during the deck repairs.

C.    *Adjudicated Value in 2011-12 Tax Year*

Plaintiff testified that Defendant dramatically increased the subject property's real market value from $94,115 in 2016-17 to $384,730 in 2017-18. (Ptf's Ex 2 at 28.) Ropp testified that the 2012-13 through 2016-17 real market values were adjudicated values and 2017-18 was the first year after the adjudicated value period. (*See id.* at 28, 34.) Plaintiff noted that Defendant's appraiser wrote the following explanation for the adjudicated value in 2011-12:

> "In essence, the extent of the needed repairs bring the structure value to $0. The appraisal notes the cost to cure as a range from $83,784 to $101,088, for an average of $92,436. If applied to the market and cost approaches, the RMV would be $147,564 to $152,564, reconciled to $148,800."

(*Id.* at 34.) Ropp testified that Plaintiff's arguments about the subject property's condition are the same as in 2011-12, but since then Plaintiff has replaced the deck and made other repairs. Plaintiff testified that the same issues existed during the 2017-18 tax year as in 2011-12.

D.    *Values*

The subject property's original 2017-18 tax roll real market value was $384,730. (Ptf's Compl at 2.) The board of property tax appeals (BOPTA) reduced that value to $303,030. (*Id.*) The 2017-18 maximum assessed value is $263,976. (*Id.*) Plaintiff requests a 2017-18 real market value of $95,615 and a 2017-18 maximum assessed value of $96,938. (*See* Ptf's Ex 2 at 16.) Defendant requests that the court sustain the 2017-18 real market value determined by BOPTA and the 2017-18 maximum assessed value.

## II. ANALYSIS

The issues presented are the real market value and maximum assessed value of the subject property for the 2017-18 tax year.

As the party seeking affirmative relief, Plaintiff bears the burden of proof by a

preponderance of the evidence. ORS 305.427.[6] A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). Evidence that is inconclusive or unpersuasive fails to meet the burden of proof. *See Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.     *Real Market Value*

"Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD 020869D, WL 21263620 at *2 (Or Tax M Div Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). "Real market value" is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1). The assessment date for the 2017-18 tax year was January 1, 2017. ORS 308.007; ORS 308.210.

Real market value "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). The three approaches to value that must be considered are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308-0240(2)(a)[7]; *see also Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003). Although all three approaches must be considered, all three approaches may not be applicable in each case. *Id*.

/ / /

---

[6] The court's references to the Oregon Revised Statutes (ORS) are to 2015.

[7] Oregon Administrative Rule (OAR).

1.    *Highest and best use*

Before determining real market value, the highest and best use of the property must be ascertained. *Freedom Fed. Savings and Loan v. Dept. of Rev.*, 310 Or 723, 727, 801 P2d 809 (1990) ("The *first* issue is the highest and best use of the property; the *second* issue is the market value of the property at that use"). Highest and best use is "the reasonably probable use of vacant land or an improved property that is legally permissible, physically possible, financially feasible, and maximally productive, which results in the highest real market value." OAR 150-308-0240(1)(e). "The test of highest and best use is not a mechanical application of whether a use is physically possible, legally permissible, financially feasible, and maximally productive. Rather, those factors must be related in each instance to the market conditions involved." *Fred Meyer, Inc. v. Dept. of Rev.*, 12 OTR 85, 88-89 (1991).

Highest and best use analysis is used to determine whether a property's improvements should be maintained, cured (in the case of deferred maintenance), modified, or demolished. Appraisal Institute, *The Appraisal of Real Estate* 43 (14th ed 2013).

> "If the value of the property as improved is greater than the value of the site as though vacant less demolition costs, the existing improvements contribute value to the property's highest and best use, and the improvements should not be demolished at that time. When the improvements no longer contribute to value, demolition and redevelopment of the ideal improvement would be economically supportable."

*Id.* at 346.

Plaintiff maintains that the highest and best use of the subject property is to tear down the existing house and prepare the vacant land for sale or redevelopment to a new single-family residence. That conclusion is based on the determination that continuing the current use of the subject property (maintaining the existing house as a rental property) is not financially feasible due to the ongoing costs to maintain the house. The problem with Plaintiff's position is that he

failed to provide a persuasive analysis of financial feasibility. Plaintiff presented a contractor's bid recommending the house be torn down and an appraisal report concluding the same, based on the contractor's bid. Neither the bid nor the report includes an analysis supporting the conclusion that demolition is the only financially feasible or best option. For instance, neither identifies the costs associated with ongoing maintenance or repair of the house. The appraiser referenced "negative NOI" but did not include any calculations.

Through testimony, Plaintiff offered a rough calculation of net operating income (NOI): he receives $12,000 per year in rental income (based on monthly rent of $1,000), but spends $15,000 per year on expenses, suggesting a net loss of $3,000 per year, not including larger expenses such as the deck replacement. The court places little weight on Plaintiff's estimate of NOI because he failed to support it with any documentation, such as a lease agreement stating the rent received as of January 1, 2017, or an accounting of expenses paid. Furthermore, any calculation of NOI must be compared with the cost of demolishing the house, estimated to be $35,757 not including the additional $69,008 proposed to improve the land through excavation, fill, and drainage.

Notwithstanding his claim that continuing the current use of the subject property is not financially feasible, Plaintiff has not demolished the house and, indeed, has spent more than $20,000 on repairs. Those decisions are difficult to reconcile with Plaintiff's position in this case. Due to the speculative nature of Plaintiff's highest and best use conclusion and his failure to provide a persuasive supporting analysis, the court declines to find that the highest and best use of the subject property was to demolish the house and return the property to vacant land.

/ / /

/ / /

2.      *Approaches to real market value*

"After establishing the property's highest and best use, an appraiser develops a final opinion of the property's real market value by considering three different 'approaches' to value: cost, income, and sales comparison." *Hewlett-Packard Co. v. Benton County Assessor*, 357 Or 598, 603, 356 P3d 70 (2015). The determination of real market value under each approach must be in accordance with the highest and best use of the property. *See generally Hewlett-Packard Co. v. Benton County Assessor*, 21 OTR 186 (2013) (rejecting each of the Department of Revenue's analyses under the three approaches because they were not developed based on the highest and best use found by the court). Here, Plaintiff's valuation of the subject property is based on his conclusion that the highest and best use is to demolish the existing house and prepare the vacant land for sale or redevelopment. Because the court has rejected Plaintiff's highest and best use conclusion, the court finds his real market value analysis unpersuasive.

The appraisal report provided by Plaintiff included a sales comparison approach finding that the subject property's real market value as of June 30, 2018, was in the range of $272,955 to $292,577. The appraiser made significant downward adjustments for the age and condition of the subject property. That value conclusion tends to support the BOPTA real market value of $303,030 rather than Plaintiff's requested real market value of $95,615. However, the court places little weight on the appraisal report because it determines a value on a date one and one-half years after the assessment date and because the appraiser did not appear to testify concerning the report. The court finds that Plaintiff has not met his burden of proof as to the subject property's real market value.

/ / /

/ / /

B.      *Maximum Assessed Value*

Maximum assessed value for a given tax year is the greater of the property's maximum assessed value or 103 percent of its assessed value for the previous tax year. ORS 308.146(1). The statute enumerates exceptions to that calculation, for example to account for new property or new improvements to property. *See, e.g.,* ORS 308.146(3)(a). Where the maximum assessed value for the tax year at issue is calculated in accordance with the statute, the court may not correct it based on alleged errors in tax years not open for adjustment. *See Kaufman v. Dept. of Rev.*, 20 OTR 159, 165 (2010) (rejecting taxpayers' argument that an error in the 2002-03 value could be corrected in the 2006-07, 2007-08, and 2008-09 maximum assessed values).

Plaintiff requests that the subject property's 2017-18 maximum assessed value be reduced to $96,938. That value is 103 percent of the 2016-17 assessed value. However, ORS 308.146(1) requires a comparison between the maximum assessed value and 103 percent of the prior year's assessed value. In this case, the subject property's maximum assessed value was $263,976, which is greater than $96,938. (*See* Ptf's Ex 2 at 34.) The subject property's maximum assessed value of $263,976 was essentially frozen after the 2011-12 tax year because its real market and assessed values were reduced to $148,800 in that year.[8] (*See id.*) The court is convinced that the 2017-18 maximum assessed value was calculated correctly in accordance with ORS 308.146(1) and finds no basis in the law to reduce it.

/ / /

/ / /

/ / /

---

[8] For an in-depth explanation and illustration of how real market value, maximum assessed value, and assessed value operate year to year under Measure 50, *see Comcast Corp. v. Dept. of Rev.*, 22 OTR 233, 260-261 (2016), *abrogated on other grounds by Dish Network Corp. v. Dept. of Rev.*, 364 Or 254, 434 P3d 379 (2019).

### III. CONCLUSION

Upon careful consideration, the court concludes that Plaintiff failed to prove by a preponderance of the evidence that the subject property's 2017-18 real market value or maximum assessed value should be reduced. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ____ day of May 2019.

_____
ALLISON R. BOOMER
MAGISTRATE

***If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.***

***Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.***

***This document was signed by Magistrate Allison R. Boomer and entered on May 21, 2019.***