IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

LOWE'S HOME IMPROVEMENT, INC.,    )
    )
    Plaintiff,    )    TC-MD 210216R
    )
    v.    )
    )
MULTNOMAH COUNTY ASSESSOR,    )
    )
    Defendant.    )    **DECISION**

Plaintiff appealed a Real Property Order from the Multnomah County Board of Property Tax Appeals (BOPTA), mailed March 25, 2021, that reduced Plaintiff's real market value from $17,941,520 to $15,670,000 for the 2020-21 tax year. Plaintiff is seeking a lower value than was determined by BOPTA. A remote video trial was held on June 6 and 7, 2022. Benjamin Blair, an attorney with Faegre Drinker Biddle & Reath LLP, appeared on behalf of Plaintiff. Jeff Buono (Buono), Senior Valuation Services Director, Colliers International Valuation & Advisory Services, testified on behalf of Plaintiff. Carlos Rasch, Assistant County Counsel, appeared on behalf of Defendant. Aaron Head (Head) and Steve Tucker (Tucker), county appraisers, testified on behalf of Defendant. Plaintiff's Exhibits 1 and 2 and Defendant's Exhibit A were received into evidence without objection.

## I. STATEMENT OF FACTS

The subject property is a 7.98-acre site with a 135,008-square-foot improvement built in 2005 specifically for and operating under a long-term lease as a Lowe's Home Improvement Warehouse. The subject property is located in Delta Park near Interstate 5 in North Portland, approximately two miles south of Vancouver, Washington. The building structure is a typical "big box" home improvement warehouse in good condition with no observable physical

obsolescence. The structure has a concrete masonry exterior with few interior walls and an outside covered garden area. The site includes 440 parking spaces.

A.      *Plaintiff's Evidence*

Buono testified that he is an MAI[1] certified general real estate appraiser with approximately 20 years of experience and a senior valuation director with Colliers International. Buono prepared a retrospective, fee-simple appraisal of the subject property's value as of January 1, 2020. The subject property is located within the Portland, Vancouver, and Hillsboro Metropolitan vicinities; a large, densely populated metropolitan service area containing over half the state's population with income levels higher than national or state medians. The subject property's proximity to southern Washington boosts the location's desirability because consumers can save money by crossing the border into Oregon and pay no retail sales tax. Buono found the subject's location had recovered from the 2009 recession, unemployment was low, and the "Portland [Metropolitan Statistical Area (MSA)'s] private-section grown indicates a broad-based and healthy continued growth." (Ex 1 at 18.) Overall, Buono found the subject's market area had low vacancy rates and a positive economic environment. He found no physical problems with the subject property, and Plaintiff had no plans to vacate the location.

Buono began by analyzing the subject property's highest and best use. Although the subject property is currently under a long-term lease, he evaluated the fee simple interest for the property as if it was a vacant space. (*Id*. at 2.) Buono divided his analysis into an "as vacant analysis" where the highest and best use is retail or commercial development and "as improved analysis" where the highest and best use is its existing use as a "retail property." (*Id*. at 35.)

///

----

[1] Member of the Appraisal Institute (MAI).

Buono rejected alternative treatments of the property such as "demolition, expansion, renovation, or conversion." (*Id.*)

Buono considered three approaches to value – the cost, sales comparison, and the income approaches. He rejected the cost approach based on the age and accrued depreciation of the subject property.

1. *Plaintiff's income approach*

Buono utilized the direct capitalization method in which comparable leases are considered; analyzing the income potential, subtracting hypothetical expenses such as vacancy and operating expenses, and capitalizing the resulting net operating income at a market supported rate to arrive at a value. The analysis applied a three percent upward adjustment from the oldest comparable sale through the assessment date. He could not find many "big box" stores and none of the comparables were "build to suit" like the subject property. Although many "big box" stores involve sale-leasebacks, none of the comparables selected involved that type of transaction. Buono did not select properties with national credit tenants because, in his view, those properties skew the market.

Buono selected six lease comparables. Comparable 1 is a 2018 lease of a 96,296-square-foot Asian supermarket, known as Shun Fat Market, in SE Portland, for $9.72 per square foot. Buono testified that the building was converted from a closed Fred Meyer and had sub-tenants, but the landlord did not pay for tenant improvements. Comparable 2 is a January 2020 lease of a 47,451-square-foot store, known as Parkrose Hardware, in West Linn, for $8.25 per square foot. Comparable 3 is a November 2019 lease of a 106,238-square-foot home decor store, known as At Home, in Kennewick, Washington, for $7.00 per square foot. Comparable 4 is a 2019 lease of an 86,502-square-foot At Home store, in Spokane, Washington, for $9.48 per square foot.

Comparable 5 is a December 2018 lease of an 85,160-square-foot At Home store, in Puyallup, Washington, for $10.36 per square foot. Comparable 6 is a November 2019 lease of a 34,389-square-foot store, known as Wilco, in Lake Oswego, for $9.50 per square foot. Buono quantitively adjusted upward for market conditions to $10.11 for Comparable 1, to $7.07 for Comparable 3, $9.67 for Comparable 4, and $9.50 for Comparable 5. Buono qualitatively adjusted for property attributes finding Comparable 1 as a good indicator of value, Comparables 2, 3, 4 and 6 as low indicator of value, and Comparable 5 as a slightly high indicator of value as to the subject property. Buono's size adjustments were predicated on the subject property hypothetically being 67,504 square feet (half of the subject's actual size) because, in his view, the smaller comparables would have higher rents per square foot (i.e. economies of scale). Buono concluded from the lease comparables a lease rate of $10.25 per square foot equating to a gross rent forecast of $1,383,832 per year.

Plaintiff's expense analysis assumed a triple-net lease, where the tenant pays for virtually all property and tax expenses. Buono further applied a "market 5% slippage" to expense reimbursements. (Ex 1 at 42.) Buono assumed real estate taxes in the amount of $259,931, property insurance in the amount of $47,253, common-area maintenance in the amount of $202,512, management fees in the amount of $54,721, and reserves in the amount of $20,251, totaling $584,667.

Buono used three techniques to develop a capitalization rate: comparable sales, investor surveys, and a "band of investment" technique. (*Id.* at 44-46.) Buono selected 15 comparables to determine the appropriate capitalization rate, finding a low of 6 percent and a high of 8.05 percent, and concluding a rate of 7.25 percent for this technique. Buono's investor surveys provided capitalization rates of 4.5 to 10 percent, with an average of 6.22 percent. Buono's band

of investment calculation indicated a capitalization rate of 6.17 percent. He testified he did not use the lower capitalization rate typically available for national credit tenants because, in his view, it would unfairly skew the rate. Ultimately, Buono found the comparable sales approach the best indicator and concluded a capitalization rate of 7.25 percent.

Buono divided the net income, $1,239,359, by the capitalization rate of 7.25 and found an initial indicated value of $17,090,000 before making a significant adjustment. Buono testified that he spoke with two brokers in the area who estimated the "lease-up costs" to be $50 per square foot and thus subtracted $6,750,000, arriving at a value of $10,340,000 for the subject property using the income approach. Buono testified that five of the six comparables had been purchased by investors and demised. Buono's report states "[t]he demising costs are based on interviews with two brokers that specialize in similar retails [sic] properties…" (*Id*. at 47.) Buono testified that, despite the language in his report, the phrase "lease-up costs" is really an adjustment for the 135,000-square-foot size of the subject property, adjusting to the smaller sizes of the lease comparables.

2. *Plaintiff's sales comparison approach*

Buono selected six comparable sales and applied an upward market adjustment of three percent for the difference between the sale date and the assessment date. He eliminated "leased-fee" sales from consideration because the values of those transactions could skew the analysis. Comparable 1 is a December 2019 sale of an 89,647-square-foot former Big K in Corvallis, for $74 per square foot. Comparable 2 is an April 2018 sale of a 136,756-square-foot former Costco in Medford, for $47 per square foot. Comparable 3 is a May 2018 sale of a 116,000-square-foot former Lowe's in Puyallup, Washington, for $88 per square foot. Comparable 4 is a September 2019 sale of a 131,880-gross-square-foot, 120,053-net-square-foot, vacant Sears store in

Vancouver, Washington, for $68 per square foot. Comparable 5 is the November 2018 sale of an 86,479-square-foot former Big K in Oregon City, for $94 per square foot. Comparable 6 is the December 2018 sale of a 133,958-square-foot former Costco in Spokane, Washington, for $50 per square foot. Buono testified that Comparables 2 to 6 were purchased by investors with the plan to demise them into multiple leases. Buono made very slight adjustments and concluded a value at $75 per square foot, equating to a value of $10,130,000. Reconciling the two approaches, Buono found the sales comparison approach value to be the best indicator of value for the subject property.

B.      *Defendant's Evidence*

Head testified he is a certified Oregon appraiser with 17 years of experience in the industry and has been a commercial property appraiser with Defendant for two years. Tucker previously worked for the Department of Revenue as part of the property appraisal and appeals team for approximately 11 years. Head and Tucker jointly prepared a retrospective fee-simple appraisal of the subject property as of the assessment date.[2]

Head determined the highest and best use for the subject property was its current use "as a national chain home improvement center." (Def's Ex A at 3.) Head described his property selection theory as follows: because the highest and best use is as a national home improvement store, he selected properties that reflect that same character and "[p]roperties that have failed, closed, or are no longer suitable for their originally intended purpose have been avoided [because] [t]hey do not reflect the highest and best use of the subject." (*Id.* at 19.) Head offered further guidance on his approach to highest and best use:

/ / /

---

[2] Defendant's witnesses testified that Head was the main author of the appraisal, and thus, this decision will refer to the appraisal as his.

"The current use as a first-generation home improvement retail center is determined to be the highest and best use. The building was designed and built as a national home improvement center, and is still a successful Lowe's store with well-maintained improvements that reflect modern home improvement design. No signs of demise are evident or alleged. This specific location and building was strategically chosen and designed to operate as a well suited home improvement center. The surrounding strong demographics, traffic counts and ease of access to residents in the state of Washington leads to purchases of large ticket items such as appliances. These out of state residents benefit from the location of this Lowes in avoiding the state of Washington's sales tax on retails purchases. The subject is well cared for as a viable continued investment, which is worthy of continued capital investments as a first-generation home improvement retail center."

(*Id.* at 21.)

Head considered all three approaches to value, finding the sales comparison approach was the best representation of value for the subject property. Head found that the western region of the nation was experiencing lower vacancy and capitalization rates and higher average rental rates than the rest of the nation.

1. *Cost approach*

Head considered sales of five comparable properties to arrive at a land-only valuation for the subject property of $5,200,000. He then used the Marshall and Swift Valuation Service and determined the cost for the property improvements minus depreciation for age was $10,880,000, resulting in a total value of $16,080,000. Head felt the cost approach was the least accurate, whereas Tucker opined that the cost approach was his preferred valuation of the property because it avoided the problem of business value-in-use from being included in real market value of the subject property.

///

///

///

///

2. *Sales comparison approach*

Head selected sales of six comparable properties.[3] He found that sales of very similar properties in the immediate area of the subject property were uncommon, and thus he widened his area to both Oregon and Washington to capture properties that matched his highest and best use determination. He testified that although some of his sales were "older," they are still relevant. Comparable 1 is a June 2020 sale of a Home Depot in Salem, for $12,200,000 or $108 per square foot. Comparable 2 is an April 2018 sale of a Lowe's in Vernon, Washington, for $16,991,453 or $124 per square foot. Comparable 3 is a July 2017 sale of a Home Depot in Portland (Jantzen Beach), Oregon, for $21,030,067 or $197 per square foot. This was part of a portfolio sale, and the dollar figure is an allocated amount. Consequently, Head did not give much weight to this sale. Comparable 4 is a June 2015 sale of a Home Depot in Tacoma, Washington, for $32,655,000 or $238 per square foot. Head felt that this sale was an "outlier" and did not place much weight on it. Comparable 5 is a September 2018 sale of a McLendon Hardware store in Puyallup, Washington, for $11,400,000 or $132 per square foot. Head found this was a good comparable sale, but also found the property was inferior. Head gave the most weight to comparables 1 and 2. He found the overall range of value to be between $108 and $238 per square foot and selected $120 per square foot as the indicated value, equating to a concluded value of $16,200,000. On cross-examination, Head testified that all six sales comparables selected were "leased fee" because they already had tenants in place. He testified and included in his report that no adjustments need to be made on account of the leased fee interest because he was valuing the fee simple property rights.

---

[3] The court will not discuss Comparable 6 because Head's report states it "was not used in the reconciliation of the Sales Comparison Approach due to its Lease hold nature." (Def's Ex A at 34.)

3. *Income approach*

Head considered six comparable property leases for the income approach to value. Comparable 1 is the lease of a Home Depot located at Mall 205 in Portland for $13.29 per square foot. Head was uncertain whether this was from a 2014 lease or a renewal. Comparable 2 is the lease of a Kohl's in Wood Village, Oregon, for $12.57 per square foot. Head did not give this lease much weight because it is a department store. Comparable 3 is a lease of a Kmart store in Oregon City at $11.80 per square foot. Head said the information about this lease was unreliable because the company may have been in bankruptcy proceedings and the property was converted to a Hobby Lobby store and a Planet Fitness gym. Comparable 4 is the lease of a Home Depot in Henderson, Nevada, for $13.68 per square foot. Head did not give this lease much weight because of the location. Comparable 5 was the lease of McLendon Hardware in Puyallup, Washington, for $8.77 per square foot. Head testified that he was uncertain about when the lease was entered into. Comparable 6 is the Shun Fat market in Portland for $9.72 per square foot, which is also Plaintiff's lease Comparable 1. Head concluded an indicated market rent of $8.75 per square foot. Using this figure Head computed the gross rental income for the subject property at $1,181,320. From that figure he deducted 6 percent for vacancy and credit loss, operating expenses of 8 percent and found a capitalization rate of 6.25 percent. Head concluded that the indicated value of the subject property using the income approach was $16,350,000.

4. *Defendant's conclusion*

Head reviewed the three approaches to value and determined the sales comparison approach was the best indicator of value at $16,200,000 for the subject property.

///

///

At issue is the real market value of a 7.98-acre site containing a 135,008-square-foot improvement built in 2005 specifically for and operating under a long-term lease as a Lowe's Home Improvement warehouse located in Portland, Oregon.  As the party seeking affirmative relief, Plaintiff bears the burden of proof by a preponderance of the evidence.  ORS 305.427.[4] A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence."  *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971).  Because real market value is the issue, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties."  ORS 305.412.  Valuation is guided by appraisal principles, but the determination of the appropriate methodology in any given case is a question of fact.  *Powell Street I, LLC v Multnomah County Assessor*, 365 Or 245, 260-61, 445 P3d 297 (2019).

A.      *Highest and Best Use of the Subject Property*

The analysis starts with the consideration of the highest and best use of the subject property.  Determining highest and best use "is necessary for establishing real market value," in part because it impacts the selection of comparable sales and leases.  OAR 150-308-0240(2)(i);[5] *Hewlett-Packard Co. v. Benton County Assessor*, 21 OTR 186, 188 (2013), *aff'd,* 357 Or 598, 356 P3d 70 (2015).  Highest and best use is "the reasonably probable use of land * * * that is legally permissible, physically possible, financially feasible, and maximally productive, which results in the highest real market value."  OAR 150-308-0240(1)(e).

///

---

[4] The court's references to the Oregon Revised Statutes (ORS) are to 2019.

[5] Oregon Administrative Rule (OAR).

The highest and best use analysis considers "all possible uses that might result from retaining, altering, or ceasing the integrated nature of the unit of property." OAR 150-308-0240(2)(i).

The parties agree that the subject property is in good condition, that Plaintiff has no intention of vacating the site, and that the property is in a "stabilized" condition. The parties also agree that the highest and best use of the property is a continuation of its existing use – although they disagree on how narrowly that use should be defined. Plaintiff urges the court to consider the existing use as general retail, while Defendant asserts the highest and best use of the property is its existing use as a home improvement warehouse. The difference between the parties' determination of highest and best use impacted the selection of properties they considered as comparable.

In *Hewlett-Packard*, the court considered the highest and best use of buildings that were approximately two-million-gross-square-feet and "were specifically constructed for the owner-occupant." 21 OTR at 187. The court found that the original use of the buildings became "outdated," and testimony indicated the property might be demised. In considering the property's highest and best use, the court stated:

> "Often there is little or no question that the current use of a property is the HBU [(highest and best use)]. However, especially in times of general economic transition or transition in particular industries, an analysis of HBU is absolutely necessary. In this case the record demonstrates that both in general terms and in terms of the industry in which this property has been employed, significant changes were underway that could well cause the property to have a different HBU."

*Id*. at 189.

The court in *Hewlett-Packard* considered the general economic outlook for the industry in which the property was employed as well as the financial feasibility. Upon review, the Oregon Supreme Court upheld the Tax Court's crediting of the taxpayer's testimony that a

market participant would only occupy a certain portion of the useable space and would pay market rates only for the space they actually used. *Hewlett-Packard,* 357 Or 598, 599, 356 P3d 70 (2015). The Tax Court's conclusion was summarized as having found the highest and best use to be "a continuation of its current use as a single-tenant, owner-occupied research and manufacturing facility." *Id* at 599.

Plaintiff's appraisal report indicates it evaluated the subject property's highest and best use as a vacant general retail space, not a more specific home improvement warehouse space. However, that evaluation is inconsistent with the general market conditions presented in the report and the testimony offered. The evidence demonstrates a positive economic outlook: vacancies in the vicinity of the subject property were down, rents were up, unemployment was low, and the MSA area was relatively affluent. There was no evidence presented showing "big box" stores or home improvement warehouses near the subject property were on the decline or transitioning. Instead, both parties indicated that they had difficulty finding sales of home improvement warehouses in the metropolitan area around the subject property. Both parties agree Plaintiff was expected to continue occupying the property. Given the evidence of the current economic conditions surrounding the subject property, the court finds that the highest and best use of the subject property is its current use as a single-tenant, owner-occupied, home improvement warehouse. That determination impacts how the court views and evaluates the comparable properties presented by the parties.

B.      *Choosing the Best Method for Determining Value*

Real market value "means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205. The

assessment date for the 2020-21 tax year is January 1, 2020. ORS 308.007; ORS 308.210. Real market value is determined in accordance with rules adopted by the Department of Revenue. ORS 308.205(2). The rules require three approaches to value be considered: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308-0240(2)(a). Although all three approaches must be considered, all three approaches may not be applicable in a given case. *Id.*

### 1. *The cost approach*

Plaintiff considered and rejected the cost approach because, in Buono's view, market participants would not rely on this method for evaluating the improvements in light of its age, accrued depreciation, and lack of marketplace data. Defendant presented a mixed opinion regarding the cost approach. Tucker found the cost approach superior to the other approaches because of the difficulties in evaluating the very large improvements, infrequent sales, and leases of similar properties. Regarding the leases of similar properties, Tucker noted market participants often used financing tools that obscure the true consideration, such as some leased-fee transactions used as financing mechanisms and portfolio sales. Further, Tucker argued the cost approach avoids the controversy between "fee simple" and "leased fee" transactions. Head, in contrast, gave little weight to the cost approach. While the cost approach does remove the potential problem of the value-in-use of the business from the calculus, the court agrees with Plaintiff that market participants would not rely on this approach when evaluating a purchase price for a building with significant depreciation.

### 2. *Income approach*

Both parties used the direct capitalization method that starts with selecting appropriate market lease comparables, determining the gross operating income, subtracting certain

hypothetical expenses, and dividing the net operating income by an overall capitalization rate. Marked differences exist in the parties' selection of comparable leases.

a. Plaintiff's evidence

Five of the six comparables Buono selected were stores that had closed. Buono made no adjustment for these circumstances even though the subject property was occupied as of the assessment date. Buono's initial calculation of the indicated value was $17,090,000—a value higher than the roll value. However, Buono next made an adjustment which his report described as "lease-up costs," based on a cost estimate to demise the property, at $6,750,000. Buono testified this was really an adjustment for the difference in size of the subject property and the smaller comparable properties. Buono testified that the cost estimate was from two brokers in the area. His appraisal report consisting of some 69 pages dedicated four sentences to the almost 40 percent adjustment.

The explanation for the significant downward adjustment based on size is unpersuasive for several reasons. First, there is a disconnect between the highest and best use, which is a single-tenant, owner-occupied property, for one that is demised into two or more units. That mismatch undercuts Plaintiff's case. *See McGrath's Public Fish House v Marion County Assessor,* TC-MD 200092R, 2022 WL 1165028, (Or Tax M Div, Apr 20, 2022) (lingering inconsistencies undermined taxpayer's comparable sales by relying on demised properties when the highest and best use is as a single undivided building). Second, although it can be appropriate for an expert appraiser to rely on information from other experts, such as real estate brokers, the expert should provide sufficient factual foundation for the court to evaluate the reliability of the information. At trial, many questions about the brokers' opinions were left unanswered regarding the specific hypothetical facts presented to them. Third, it is axiomatic of

the appraisal process that the greater the adjustments to comparable properties, the less the properties are truly comparable. An almost 40 percent adjustment is a very large change and requires more thorough explanation than was provided at trial. Fourth, the large adjustment looks like a stabilization adjustment; however, stabilization adjustments are appropriate only when the facts of case demonstrate that such an adjustment is warranted. *See*, *Powell Street I*, 365 Or at 260 (loss of anchor tenant expected to impact the property for 18 to 24 months); *BDC/Bend SPE, LLC v Deschutes County Assessor*, TC-MD 210180R, 2023 WL 155125 (Or Tax M Div, Jan 11, 2023) (finding a newly opened senior independent living facility needed months to reach stabilized income.) Lastly, the court is not persuaded that costs to demise the property is equivalent to a price per square foot adjustment based on the size of the subject property. For all the above reasons, the court is not persuaded by Plaintiff's income approach analysis.

b. Defendant's income approach

Defendant selected six comparable leases for the income approach. While several of the leases appear on their face to be relatively comparable, Head's testimony was consistently uncertain. Head was not certain about the leases in Comparables 1 and 5, and there were negative factors affecting the leases of Comparables 2, 3, and 4.[6] Comparable 6 was also used by Plaintiff; however, the lease of a closed Fred Meyer had the new tenant paying for its own improvements and that factor was not adjusted for. In totality, the court finds Defendant's income approach analysis was not adequately developed and as a result, the court is not persuaded by Defendant's income approach.

---

[6] Comparable 2 was a department store that Head acknowledged was not really comparable. Comparable 3 was in Defendant's "database" but Head did not know the source of the information. The lease in Comparable 4 was from 2013, but Head was not certain whether it was an original lease or renewal.

3. *Sales comparison approach*

"In utilizing the sales comparison approach, only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length transactions." OAR 150-308-0240(2)(c).

There are several theoretical methodologies in using the sales comparison approach for valuing commercial property. The first way would be to assume the current owner is both the fee-simple owner and a long-term lessee. That method would be most advantageous to tax assessors, as it would maximize the value and probably be the most accurate valuation on the property as to Plaintiff's current economic situation. The problem with that method is "Oregon law requires the use of market value, not 'value in use.'" *Ellison v. Dept. of Rev.*, 362 Or 148, 169, 404 P3d 933 (2017), *opinion adh'd to as modified on recons,* 362 Or 527, 412 P3d 201 (2018). Thus, this method would be representative only of the current user's value-in-use but would not reflect the market's valuation for a hypothetical user.

A second way to approach the valuation would be to assume it is completely vacant, which is how Plaintiff appears to assess the property. That method would be most advantageous to "big box" stores, like Plaintiff, as it would minimize the value of the property. The appraiser would look at the number of entities that could handle a very large store, determine that the number is few, and make an adjustment to reflect the cost of dividing the property into smaller spaces. Further, selection of comparable properties would be of stores that had gone out of business or were dark. Plaintiff argues that "[t]he Court has [stated] that the presumed lack of occupancy at the time of sale is an explicit requirement of the fee simple premise." (Ptf's Written Closing Arg at 5 (citing *Powell Street I*, 22 OTR at 436).) However, that is an

incomplete and misleading statement of Oregon law. *Powell Street I* stands for the proposition that property is presumed to be occupied by a hypothetical entity while also considered to be immediately available for a new owner/tenant. 365 Or at 256. The problem with Plaintiff's view is the evidence shows the property is currently owner-occupied by a single entity and economic conditions are good. Those factors favor the continuation of the property's current use. Thus, Oregon law requires the court to assume the property is occupied by a single hypothetical entity, while at the same time being available to a purchaser who could take immediate occupancy.

In the court's view, neither of the above approaches in a vacuum is the correct approach. Rather, the appraiser must first determine the economic conditions in the market to determine appropriate comparable properties. If the market is showing a trend towards home improvement "big box" stores being closed and demised, then it might be appropriate to use comparable properties in conformance with those types of market conditions. Indeed, an example of that was briefly discussed during trial: a nearby Costco recently closed a long-term store to open a new and bigger store nearby. At the time of trial, it was too early to see what would become of the closed "big box" store – whether it would be sold whole, demolished, or demised was unknown at that time. In contrast, if the market is showing strength, and "big box" stores are rarely closing or being demised, then selections of comparable properties should reflect that fact.

a. Plaintiff's sales comparison approach

Plaintiff presented six comparable sales that are all closed "big box" stores. Several appeared to be purchased with the intent to divide them into multiple units. Plaintiff made no adjustments on account of their vacant status. The evidence presented does not support Plaintiff's selections as being the most indicative of the market conditions present on the date of assessment. Plaintiff's sales-comparison approach does not match the evidence in the case and

incorrectly assumes the property is vacant. Thus, the court is not persuaded by Plaintiff's sales comparison analysis.

        a.   Defendant's sales comparison approach

Defendant selected six sales of large home improvement stores for analysis. Head did not consider Comparable 6 in his final reconciliation because he felt the leasehold interest impacted the sales price. Similarly, he had concerns about Comparable 3 because the sale price was allocated from a portfolio sale. The remaining sales were all relatively recent sales within the larger geographic area. Plaintiff argues that those sales "value the wrong property interest" because the properties all had preexisting leases in place and thus "[t]hose buyers were buying existing income streams from highly creditworthy tenants." (Ptf's Written Closing Arg at 10.) Plaintiff's concerns are potentially valid as the purchase price of a property with a high-credit tenant and a long-term lease could theoretically impact the transaction. *The Appraisal of Real Estate* acknowledges "[t]he relationship between contract rent and market rent greatly affects the value of a leasehold" if there is a mismatch between the actual market rent to the actual market rents. *The Appraisal of Real Estate at* 62 (15th ed 2020).

In *Powell Street I*, the Oregon Supreme Court recognized that valuation for Oregon property tax purposes may not be the same as valuation for other purposes:

> "When the property is subject to leases (as is the case for the shopping center here), the value for property tax purposes may differ from the price that the owner actually might receive for the property. That is because the property tax is assessed on the fee simple interest in the property, which is the value of all interests in the property, including those of the owner (ordinarily the lessor) and any lessees."

365 Or at 248. In this case, the evidence is not clear whether an adjustment was warranted because Defendant did not examine the impact of existing leases in place for the sales comparables.

The court is unable to ascertain whether there was a disconnect between market rents and sales prices. Thus, the court cannot rely on Defendant's sales comparable analysis.

D.    *Real Market Value Conclusions*

Ultimately, the court is not persuaded by either party's evidence of value for the subject property because the comparable sale selections and/or lack of adjustment do not reflect the market evidence.

## III.  CONCLUSION

It is Plaintiff's burden to prove the real market value is lower than that of the tax roll. ORS 305.427. Plaintiff has not met its burden of proof that the real market value of the subject property was lower than the BOPTA value. Additionally, Defendant has not met its burden of proof that the real market value of the subject property was greater than the Board's value. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this _____ day of October 2023.

RICHARD DAVIS
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by* <u>mailing</u> *to: 1163 State Street, Salem, OR 97301-2563; or by* <u>hand delivery</u> *to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within* <u>60</u> *days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Richard Davis and entered on October 12, 2023.*